Michael Garth Moore (023742)
9040 North Placita Verde
Tucson, Arizona 85704
Telephone: 888-318-0075
mike@mgmoorelaw.com

Trial Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Karl Daschke | : |
| 8942 East Autumn Sage Street | |
| Tucson, Arizona 85747 | : |
| | |
| and | : |
| | |
| Gretchen Daschke | : |
| 8942 East Autumn Sage Street | |
| Tucson, Arizona 85747 | : |
| | |
| and | : |
| | |
| Joshua Daschke | : |
| 8942 East Autumn Sage Street | |
| Tucson, Arizona 85747 | : |
| | |
| and | :   Civil Action No. _____ |
| | |
| Gretchen Daschke, mother and Legal | :   Jury Demand endorsed Hereon |
| Guardian of ZD, a minor | |
| 8942 East Autumn Sage Street | : |
| Tucson, Arizona 85747 | |
| | : |
| and | |
| | : |
| Gretchen Daschke, mother and Legal | |
| Guardian of ND, a minor | : |
| 8942 East Autumn Sage Street | |
| Tucson, Arizona 85747, | : |
| | |
| Plaintiffs | |

1    -vs-                                      :

2    Theodore Hartenstein #6869               :
3    Pima County Sheriff Deputy
     1750 East Benson Highway                 :
4    Tucson, Arizona 85714

5                                             :
            and
6                                             :

7    J.P. Siress # 7341                       :
     Pima County Sheriff Deputy
8    1750 East Benson Highway                 :
     Tucson, Arizona 85714
9                                             :

10          and                               :

11   Mark Napier                              :
12   Pima County Sheriff
     1750 East Benson Highway                 :
13   Tucson, Arizona 85714

14                                            :
            AND
15                                            :

16   The Pima County Board of
     Supervisors                              :
17   130 West Congress Street
18   Tucson, Arizona 85701                    :

19          and                               :

20                                            :
     Gerardo Telemantes
21   Arizona Department of Child
     Safety                                   :
22   6363 South Country Club Road
23   Suite 151                                :
     Tucson, Arizona 85706
24                                            :

25          and                               :

26   Mildred Jimenez                          :
27   Arizona Department of Child
     Safety
28   6363 South Country Club Road             :

2

Suite 151
Tucson, Arizona 85706,                         :

         and                         :

                                   :

Valerie Wilhoite
Arizona Department of Child            :
Safety                                :
6363 South Country Club Road
Suite 151                             :
Tucson, Arizona 85706,

                                   :

         and                         :

Karla Grove
Arizona Department of Child            :
Safety
6363 South Country Club Road
Suite 151                             :
Tucson, Arizona 85706,                :

                                   :

        Defendants

## **COMPLAINT**

## **I. INTRODUCTION, PARTIES, JURISDICTION**

1.     At all times pertinent hereto, Plaintiffs Karl and Gretchen Daschke were

husband and wife, and resided at the above-identified address with their children, Joshua,

ZD and ND;

2.     At all times pertinent hereto, Defendant Mark Napier was Sheriff of Pima

County. He is sued in his official capacity, as is The Pima County Board of Supervisors,

which is an additional real party in interest with respect to payment of any judgment

rendered against Napier in this case. The term "Senior Command," referred to herein, to

Plaintiffs' information and belief, is constituted of high level chief deputies delegated the final decisionmaking as to the conduct of the investigations and acts asserted herein;

3.      At all times pertinent hereto, Defendants Theodore Hartenstein and J.P. Siress were sworn law enforcement officers, employed as Deputies by Mark Napier, Pima County Sheriff;

4.      At all times pertinent hereto, Defendants Gerardo Telemantes was employed by the Arizona Department of Child Safety [hereafter, "AZDCS"] as an investigator; Defendant Wilhoite was also employed by AZDCS;

4.      At all times pertinent hereto, Defendant Mildred Jimenez was employed by the AZDCS as a Supervisor, and in that capacity, supervised the work of Defendant Telemontes. Defendant Karla Davis was employed by AZDCS in the capacity of Unit Supervisor, supervising both Telemontes and Jimenez;

5.      The actions and omissions alleged herein attributable to these Defendants were done with malice towards Plaintiffs and/or in reckless disregard of Plaintiffs' Constitutional rights. The actions and omissions were taken by the Defendants in their capacities of state actors in the scope and course of their duties. Defendants, except for Napier and The Pima County Board of Supervisors, are sued in their individual capacities;

6.      This case is brought to viNndcate rights of the Plaintiffs secured by the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, pursuant to 42 U.S.C. §1983;

7.      This Court has jurisdiction of this case pursuant to federal question

jurisdiction, 28 U.S.C. §1331;

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391;

## II. FACTS

### THE INVESTIGATION, SEARCH AND ARREST

9.      Beginning before, or in the spring of, 2016, Pima County Sheriff deputies were repeatedly called to investigate reports of suspicious activities that involved very large numbers of cars and individuals congregating at unoccupied homes in high-end areas of the county;

10.     In responding, deputies would encounter unoccupied homes that were listed for sale, with evidence of break-ins and many people having been in the homes;

11.     Deputies also would come upon many cars and hundreds of persons in the homes and in surrouNDing residential areas;

12.     In detaining and questioning persons present, deputies learned that the participants included large numbers of adolescents, the use of illegal drugs and alcohol, and that what the Pima County Sheriff came to call "Mansion Parties" were publicized through social media;

13.     The senior command of the Pima County Sheriff Department [which included the Sheriff and/or his delegated representatives] became concerned with the Department's inability to interdict the ongoing activities, and assigned, among others, Defendants Hartenstein and Siress to identify and arrest parties assumed by the Department to be those behind the epidemic of illegal activities;

14.     Information obtained by investigation of incidents leading up to August,

2016, resulted in the identification of a number of persons of interest, none of whom were identified as ZD;

15.     On the night of August 12-13, 2016, deputies responded to three separate reports of similar activities at different locations;

16.     At one of the locations, 660 North Mountain Side Way, deputies, upon arrival, fouND a party in which huNDreds of persons were present, but failed to detain a single person;

17.     In entering the home, deputies fouND very substantial damage to the interior, later estimated to be in excess of $30,000.00 in value;

18.     In the following days, citizens brought to the Department social media posts which implicated a number of persons in the events at 660 North Mountain Side Way, including minors TC, LD, AC, Jose Toledo and Carlos McDowell, among other names;

19.     Senior Command, upon learning of the incident at 660 North Mountain Side Way, were concerned about adverse publicity that the Department could be subject to if Hartenstein and his subordinates did not quickly interdict the ongoing Mansion Parties and arrest those allegedly masterminding the events;

20.     Hartenstein, at Senior Command's direction, set up a surveillance operation of high-end homes that were vacant and for sale in order to stop the incidents;

21.     On the night of August 20, 2016, deputies were called to another Mansion Party where they detained minorTC and another underage female, LD;

22.     TC was interrogated that night by Defendant Hartenstein, interrogations

which were recorded and later reduced to hard copy;

23.     In the interrogations, TC admitted involvement in a number of Mansion Parties, and identified Carlos McDowell as the organizer of the 660 North Mountain Side Way event at which the extensive damage had been done. In response to questions regarding those responsible for the damages, Hartenstein documented TC's response that she had seen "individuals known to her as Alex, who has nickname of The Russian, Jose, Zach and Jordan actually running through the interior walls of the house…." [Pima County Sheriff Detail Incident Report #160813023, 68/180]. In the interview, TC denied knowing "Zach's" last name and no other identifying information regarding him was sought by the questioners;

24.     In questioning  about the manner in which the parties were publicized, TC responded that "she had received invitations to these parties from social media, mainly Snapchat and Twitter; however, the invitations had been forwarded from other people and she did not know who the original source was." [Pima County Sheriff Detail Incident Report #160813023, 68/180];

25.     On the night of the 20th, Hartenstein arrested TC on charges of Criminal Trespass and she was subsequently released;

26.     On the night of the 20th, LD was also detained, and interrogated, but claimed loss of memory of past events because of her use of drugs. Her interrogation supplied no information regarding ZD or any other participant;

27.     Hartenstein took possession of TC's cellphone and subsequent forensic downloads produced dozens of identities of persons Hartenstein identified as "suspects"

or "persons of interest" in participation in the Mansion Parties;

28.     One of the persons who name appeared in the downloads was ZD;

29.     During her interrogation, TC made a number of indisputably false statements, including lying about her age;

30.     On or about September 19, 2016, Hartenstein organized an operation intended to detain and interview "suspects" whose attendance in Mansion Parties was indicated by phone data, and to seize the phones of the adolescents and adults identified. Nineteen (19) persons were initially identified in the Affidavit for Search Warrant written by Hartenstein;

31.     The Affidavit was presented on September 19th, and a Search Warrant for the named individuals obtained;

32.     On September 20th, Hartenstein caused the Search Warrant to be ameNDed, adding the name of ZD to those subject to search and seizure;

33.     As of September 20th, the only information Hartenstein had connecting ZD to any Mansion Party was the appearance of his name on TC's phone. TC had shown the investigators a picture of the "Zach" who was engaged in damage at the 660 address. That individual is black. ZD is Caucasian. There was no information connecting ZD with any other Mansion Party;

34.     In the following days, Hartenstein, Siress, and deputies under their direction contacted, interrogated a number of "suspects" and seized the phones of a number of the adolescents targeted in the warrant;

35.     The deputies did not follow up on contacting ZD;

8

36.     During the interrogations, deputies were directed to, and did, question each person as to their involvement in organizing the Mansion Parties and the means used to publicize the events;

37.     These interviews, and subsequent forensic examinations of the seized devices failed to identify the supposed "organizers" of the Mansion Parties, and particularly, did not add to the information Hartenstein had obtained from TC and her phone regarding ZD;

38.     However, the interviews did confirm that certain of the information TC had provided as to the participants of the 660 North Mountain Side Way events was untrue. TC and/or downloads from her phone had identified minors CC and SA as being present during the events. Hartenstein confirmed that this information was not true;

39.     Following the forensic analysis of the seized devices, Hartenstein and Senior Command became increasingly frustrated that they were unable to pinpoint the supposed mastermind(s) behind the Mansion Parties. Senior Command put even more pressure on Hartenstein to secure arrests, and made clear Command was not concerned with Hartenstein establishing probable cause for an arrest;

40.     On or before October 25, 2016, Hartenstein learned of continuing activity on TC's Twitter account through monitoring conducted by the Pima County Sheriff IT forensic techs, and obtained downloads of the activity, which revealed that she continued to communicate information regarding on-going Mansion Parties. Hartenstein also had evidence of potential criminal activities by her mother and other relatives secured from the phone seized in August;

41.     With that information, Hartenstein prepared an Affidavit for Search Warrant, and from that Affidavit secured a Search Warrant to search two dwellings occupied by TC and her family and to obtain fingerprints and DNA from TC;

42.     On October 26th, Hartenstein led a team of deputies in searches of the two dwellings, the detainer of a number of individuals, and the arrest of TC;

43.     TC was then interrogated by a team of detectives and deputies led by Hartenstein. When questioned again about the 660 North Mountain Side Way incident, in TC identified another previously-undisclosed individual, James, whom she claimed was one of the ones engaged in damaging of the property; she re-confirmed that Carlos McDowell was the one who organized the events; that Jose Toledo initiated the criminal damaging; and that LD and AC were present;

44.     When questioned about "Zach," TC again denied knowing his last name, but told the deputies that Zach went by the alias "Brizo" and specifically identified this "Brizo" as the "Zach" who participated in the damaging of the home. As before, the questioners sought no other identifying information regarding this "Zach/Brizo";

45.     At one point she was shown a photo from her phone, which showed a picture of ZD, nude, from the rear. TC explained that the photo had been sent to her over Snapchat by another person, and denied any sexual activity with ZD;

46.     At no time in the two interrogations was TC asked if any person named "Zach" had any connection with a Twitter account named "#TucsonParties";

47.     AC was detained on November 3, 2016, and was interrogated by Hartenstein;

10

48.     When questioned about the organizer of the 660 North Mountain Side Way event, AC confirmed it was Carlos McDowell;

49.     When questioned about the persons causing damage, she stated she saw who had done it, named Jose Toledo, and added that a couple of his friends had also done the damage, that she did not know their names, but that they went to Tucson High;

50.     When questioned about a white kid named "Zach," AC denied having seen him doing damage at the home, and added that she knew he ran a Twitter page called "Tucson Addys" or "Town Addys or something like that";

51.     AC confirmed that CC was not at the 660 North Mountain Side Way event, contradicting TC's original account;

52.     During the interrogation, AC was pressured repeatedly to come up with more names of those at the 660 North Mountain Side Way event, and at one point, responded, "But I could say anyone was there;"

53.     When this did not end the quest for names, she gave multiple names of alleged participants, and this time, added "That Zach kid you mentioned before was there";

54.     On October 29, 2016, deputies had responded to two calls, one a report of an armed robbery; the secoND, a report of an ongoing Mansion Party. On November 16, 2016, Hartenstein and Detective Garcia interrogated one Vanessa Olympia Mendez, who had made multiple social media posts publicizing the Mansion Party on the night of October 29, 2016. Hartenstein questioned Mendez, who admitted she publicized the party, obtained alcohol for the party, and provided alcohol at the party to minors;

55.     Hartenstein arrested Mendez;

56.     During the interrogation, Mendez made no mention of ZD being involved;

57.     On November 22, 2016, Hartenstein created a Supplemental Narrative naming ZD as a "suspect" in the investigation of the October 29, 2016 incident, claiming that the party had been advertised over the #TucsonParties Twitter account and falsely stating that the account "was identified by witnesses as possibly managed by ZD for the purpose of advertising underage alcohol drinking parties, sometimes referred to as "mansion parties…" [Pima County Sheriff Detail Incident Report # 161029006, p. 11-12/14;

58.     Hartenstein identified the case as "connected" to # 16813023 [660 North Mountain Side Way] because of ZD's alleged involvement in publicizing both events;

59.     On November 6, 2016, deputies responded to yet another disturbance call, fouND a scene similar to the other Mansion Party locations, and subsequently identified six (6) individuals as "investigative leads." On November 22, 2016, Hartenstein added ZD's name to the report as a "suspect," using the same wording he used when naming ZD as a suspect in the earlier investigation [Pima County Sheriff Detail Incident Report # 161106011, p. 7/8. Hartenstein also identified the case as "connected" to the 660 North Mountain Side Way investigation;

60.     On November 19, 2016, another Mansion Party was reported, deputies responded, detained a number of minors, but then learned that the dwelling was owned by the mother of one of the adolescents detained, no alcohol or drugs were found, and the deputies ended the investigation;

61.     On November 22, 2016, Hartenstein created a Supplemental Narrative, identifying ZD as a "suspect," using the identical language as the earlier two investigations, and connecting that investigation with the 660 Mountain Side Way investigation [Pima County Sheriff Detail Incident Report # 161119320, p. 8/8];

62.     Hartenstein, in response to this rash of reported Mansion Parties, in consultation with Siress and Senior Command, made the decision that ZD would be targeted as the "mastermind" of the Mansion Parties, though he knew there was no probable cause to arrest ZD for any offense. Senior Command explicitly or implicitly approved this decision;

63.     From that point forward, the Pima County Sheriff investigation into the actual source(s) of the organization, if any, of the Mansion Parties, ended. The sole goal from that date was to secure arrest and conviction of ZD. It was for this reason that Hartenstein used the false pretext of ZD being the "manager" of #TusconParties to name him as a suspect in the last three incidents;

64.     On November 28, 2016, Hartenstein called Gretchen Daschke, asking her to bring ZD down to the Pima County Sheriff for an "interview." When the parents declined to produce him or to consent for an interview without an attorney present, Hartenstein informed Karl Daschke, falsely, that he had probable cause to arrest ZD. In subsequent calls made on November 30th to Gretchen and ZD, Hartenstein again falsely claimed he had probable cause to arrest ZD, and if ZD did not appear, he would have an arrest warrant issued. He threatened the parents that ZD was responsible for "thousands of dollars of criminal damage, and that the parents could be held finandially liable for

their minor child….";

65.     When Gretchen and Karl did not cooperate with Hartenstein arresting ZD, he became angry. Between November 29th and December 13th, he and Siress conspired to prepare an Affidavit for Search Warrant, which was assigned the number 16 SW 2389;

66.     In the Affidavit, the two Defendants made false material representations of fact. Those include, but are not limited to:

1.  "ZD is an associate of TC."

2.  "TC identified ZD as a person she had an intimate sexual relationship with during an interview."

3.  "During post-arrest interviews, both TC and AC (another coDefendant) indicated that the "Tucsonparties" account was managed by ZD."

4.  "TC and AC both stated that they saw ZD at the party where the most criminal damage occurred, 600 N Mountain Side Way on 8/12/12/206. They stated that he was an active participant in the events of that party."

5.  "The evidence suggests that ZD is a key participant in promotion illegal parties in Pima County, and that he has himself been an active participant in some of these events."

67.     Attempting to further implicate ZD in the #TucsonParties tweets, Defendants falsely represented that four tweets in October, 2016, monitored from TC's account, annouNDing upcoming parties, originated with #TucsonParties. Defendants falsely reported that "TC and several others 'retweeted' the party annouNDements originated by ZD";

68.     Defendants drafted the language of the Affidavit to leave the inescapable impression that TC was a reliable informant, AC was also a reliable informant, and that others had corroborated the alleged statements. They knew this to be false, and

14

coNDealed from the reviewing magistrate the fact that TC had been shown to dissemble, had changed her story, and, when she was directly confronted by Defendants with questions about "Zach," had identified a Zach who used the alias "Brizo" as one of the individuals present at 660 North Mountain Side Way who caused the property damage;

69.     Defendants knew, or were reckless and wanton in refusing to investigate the fact that "Brizo" was an alias of another person who appeared on the social media downloads obtained by Pima County forensic technicians in the months leading up to December, 2016;

70.     In the absence of the outright false representation the misrepresentations, and the concealment of material information, the Affidavit lacked any evidence to allow the conclusion that there was probable cause to connect ZD with any crime;

71.     Although no person interviewed had named ZD as the "manager" of #TucsonParties," Defendants knew that AC had identified someone named ZD as having something to do with a separate Twitter account called #Tucsonaddys" or "#Townaddys." Despite knowing this, Defendants made no investigation of the existence of other Twitter accounts with the same or similar names;

72.     Without any investigation at all of ZD, Gretchen Daschke, Joshua Daschke or Karl Daschke, Defendants sought a warrant that would entitle them to (1) seize ZD's DNA; (2) take his fingerprints; (3) take unlimited photographs of him; (4) search four ((4)) vehicles owned by Gretchen and Karl Daschke; (5) search the dwelling located at 8242 Autumn Sage Street; and (6) seize

Indicia of occupancy, residency, and ownership of the premises and / vehicle described above including but not limited to utility and/ or telephone bills, cancelled envelopes, registration, and keys.

Any items that could identify suspects and/ or co-conspirators as yet unidentified to include but not limited to, identification cards, driver license, passports, paperwork, programmable instruments such as telephones, electronic calendars, and address books.

Any Narcotic or Dangerous drugs as defined in Arizona Revised Statutes to include, Marijuana, and prescription-only drugs. Any paraphernalia associated with these types of drugs to include pipes, bongs, filters, packaging materials, cutting agents, and scales.

Any cellular telephones, pagers, electronic telephone/ address books, or other electronic device capable of containing or storing digital messages, and the contents of their memory, and any digital messages received while in the possession of this warrant to include viewing and analysis of their contents.

Forensic download of the contents of the memory of the cell phone(s) to include, but not limited to, photographs, text messages, incoming and outgoing phone numbers, and any and all media.

73.     As written, the Affidavit, and attachments Defendants appended to it, failed to establish probable cause to search the dwelling or the vehicles for the specific categories of property identified;

74.     Despite this facial lack of probable cause, on December 13, 2016, a judge executed the Search Warrant sought without limitation;

75.     In the early morning of December 14, 2016, two Pima County Deputies entered the Plaintiff's home without consent and without physical possession of a warrant. Following this, Hartenstein and Siress led a team of deputies in serving the warrant on the Plaintiffs, entering their home, searching it and seizing electronic devices and other property;

76.     On that date, Hartenstein and Siress arrested ZD, transported him to the Pima County Sheriff department, seized his DNA, took his fingerprints, and caused him to be photographed hundreds of times;

77.     Before ZD was seized, Karl Daschke repeatedly told him, in the presence of Hartenstein, to not answer any questions which might be put to him. This instruction from the parent angered Hartenstein. ZD, during his custody, declined to answer any questions;

78.     On December 14, Hartenstein finally notified Twitter of his "urgent request for assistance" in the company preserving records of three accounts, including #TucsonParties. Hartenstein informed Twitter that a "court order" would follow compelling the company to disclose the information to the Pima County Sheriff;

**INVOLVEMENT OF AZDCS DEFENDANTS**

79.     On or shortly after December 14th, Hartentstein contacted AZDCS where he was put in contact with Defendant Telemontes;

80.     Hartenstein related false information to Telemontes, primarily focused on the allegation that ZD was "running" the #TucsonParties twitterfeed, "promoting & advertising underage drinking, drugs and casual sex parties…." He also repeated the falsehood that ZD was having a "sexual relations" with TC, aged 14, and had "sent a naked picture of himself" to TC. He also informed Telemontes about the trace amount of cocaine fouND in ZD's wallet and bottle of liquor also fouND during the search;

81.     Hartenstein specifically claimed that ZD had posted another "'party' onto the website (sic)" on December 15th, the day after his arrest," and used that as a basis for

accusing Karl and Gretchen as appearing "unable to control ZD's behavior since becoming aware of the behavior….";

82.     Hartenstein told Telemontes that ZD "is facing felony charges of 2ND degree burglary, criminal damage in excess of $10,000, possession of cocaine, multiple counts of contributing to the delinquency of minors; minor in possession of alcohol and alcohol within the passenger and driver area….";

83.     Hartenstein knew at the time he  made the report to Telemontes that the criminal charges he alleged ZD was facing were false, or based on evidence collected in violation of the Fourth Amendment;

84.     Hartenstein's intent in making the report and urging Telemontes to investigate was to influence AZDCS to threaten the removal of ZD and ND from the parents' custody, and, failing that, to effectuate an emergency removal with the expectation that the threat or removals would cause the parents to compel ZD to cooperate with the criminal investigation and accept blame as "mastermind" of the Mansion Parties;

85.     Telemontes, with the approval of Defendant Jimenez, did open a joint investigation with Pima County Sheriff;

86.     On December 20th, Telemontes went to the school attended by ND and without notifying the parents and obtaining consent, interrogated him. Telemontes' report misrepresented the information ND provided to him, putting ZD and his past conduct in false light;

87.     That day Telemontes interviewed Jennifer Wright, Counselor, and Rebecca Marsh, Assistant Principal of the Desert View Middle School, attended by ND. Though they reported to him that on December 19th, it had been found that ND had "cut himself," the women noted that this was the first instance of such behavior, and that they had "no imminent safety concerns for ND";

88.     Telemontes made no effort to interview ND about the matter, nor to view any evidence of "cuts" on ND;

89.     Later that day, Telemontes appeared at the Daschke's home where he conducted interrogations of ZD, Karl, Gretchen and Joshua. None of these interrogations of family members produced any evidence of any minor having been the victim of abuse or neglect, nor in imminent danger of becoming so. The information obtained contradicted claims made by Hartenstein;

90.     Between December 21st and 28th, Telemontes and Jimenez conferred with Hartenstein and agreed with the detective's request that ZD and ND be removed from parental custody on an emergency basis. The Defendants knew at the time that there was no probable cause to conclude that either minor had been abused or neglected, or was in imminent danger of such abuse or neglect;

91.     Telemontes then created an "Assessment of Risk Factors" that falsified the "out of control behaviors" and specifically identified as a factor in justifying the emergency removal that "parents have refused to cooperate with law enforcement and failed to control his criminal activity;"

92.     Jimenez approved this "assessment" knowing that it was based on false and misrepresented facts, because of the AZDCS Defendants' desire to cooperate with the Sheriff's criminal investigation and force the parents and ZD to cooperate. Grove also reviewed and approved the assessment;

94.     Defendants set up a "Team Decision Making" meeting and called Karl and Gretchen to the meeting on December 22ND. By this time the decision to remove the two minor boys had already been made. Defendant Wilhoite was identified as the "facilitator" of the meeting, though she was fully briefed by Telemontes and Jimenez of the purpose of the meeting. Hartenstein attended;

95.     At the meeting, Defendants Telemontes and Hartenstein repeated the false allegations against ZD, concerning ND's alleged "cutting," and the parents' alleged "inability" to control ZD;

96.     At the conclusion of the meeting, Wilhoite prepared a "Summary Report" of the meeting, in which she renewed the false allegations made, and also omitted material information supplied by the parents that contradicted some claims;

97.     The AZDCS Defendants informed Karl and Gretchen that ZD and ND would be immediately removed from their custody because of their "failure to cooperate";

98.     Immediately following the meeting, Telemontes prepared a "Temporary Custody Notice" for each minor, citing "neglect" as the grounds. Telemontes left blank the portion of the form that required the investigator to identify the "imminent risk

factors" that "most clearly describes (sic) the reason temporary custody was

necessary…;"

99.    Telemontes then went to the Plaintiff's home and served the Notices on the

parents, in the presence of officers of the Tucson Police Department. He seized custody

of ZD at that moment;

100.    On December 23rd, ND surrendered to Telemontes who assumed custody

for AZDCS;

101.    ND was placed in a dangerous, abusive environment, where other detainees

were using drugs and engaging in intimidation and fights. ND was terrified for his safety;

102.    On that date, he was interviewed by an LISW, Guadalupe Valenzuela, on a

"rapid response referral." As a result of her professional evaluation of ND, she reported

that ND and his household presented a "low" immediate safety risk;

103.    On the same date, Valenzuela conducted the same forensic evaluation of

ZD, and assigned him the same low "imminent safety risk;"

104.    Defendants Telemontes and Jimenez reviewed Valenzuela's reports, which

revealed no imminent risk of harm to either minor from the household, but did not

immediately act to return the boys to their parents' custody;

105.    On December 29th, Telemontes and Jimenez prepared a report to the

Juvenile Court under Case No. JD20160875, seeking to maintain legal custody of the two

minors, and, in so doing, repeated the false and misleading information conveyed by

Hartenstein, and augmented by Telemontes in his earlier documentation. Grove, knowing

the information was false, approved the document;

21

106.   On December 30th, the Juvenile Court held an Initial Dependcy hearing on AZDCS Petition. As a result of the hearing, the Court denied Defendants' Petition to maintain legal custody of the minors, and ordered them released to Karl and Gretchen;

107.   On March 8, 2017, the Juvenile Court dismissed the case;

**THE CRIMINAL CASE**

108.   On January 10, 2017, a criminal Dependency Petition, Case No. JV 20170027 was filed in Juvenile Court;

109.   The charges made against ZD were: (1) Burglary, a Class 3 Felony; (2) Criminal Damaging, a Class 4 Felony; (3) Criminal Trespass, a Class 6 Felony [all alleged to have occurred on August 13, 2016]; (4) Narcotic Drug Possession, a Class 4 Felony; and (5) a Minor in Possession, a Class 1 Misdemeanor;

110.   On July 24, 2017, the charges were dismissed;

**III. FIRST CLAIM: CLAIM OF ZD: CLAIM AGAINST HARTENSTEIN AND SIRESS: FOURTH AND FOURTEENTHAMENDMENT VIOLATIONS: JUDICIAL DECEPTION AND FALSIFICATION**

111.   Plaintiffs reallege Paragraphs 1 through 110;

112.   This Claim is brought to vindicate rights of ZD under the Fourth and Fourteenth Amendments to the Constitution of the United States:

113.   Defendants' falsifications, misrepresentations and material omissions in the Mansion Party investigations, carried forward in the Affidavit for Search Warrant 16 SW1689 resulted in the execution of the Search Warrant, executed by Defendants and Pima County Sheriff deputies under the direction of Defendants,  and the arrest and filing of the criminal charges against ZD;

114.    The Search Warrant secured by Defendants was invalid in failing to qualify under the Fourth Amendment, and though Defendants knew this, they organized the team of deputies and ordered the searches and seizures of the property;

115.    The search of ZD's home and personal effects, the seizure of his DNA, taking of fingerprints and hundreds of photographs violated his rights under the Fourth and Fourteenth Amendments;

116.    In the course of the search, deputies seized electronic devices used by ZD which contained personal private information and on-line activities;

117.    Defendants caused the download of the contents and histories of the electronic devices used by ZD and forensic technicians, Defendants, and others, accessed and reviewed the data;

118.    The seizure and arrest of ZD, without probable cause, violated his right against unreasonable seizure under the Fourth and Fourteenth Amendments;

119.    Defendants' falsifications, misrepresentations and material omissions made to the AZDCS Defendants resulted in the seizure and detention of ZD by AZDCS, the institution of dependency proceedings, and subsequent seizures and processing of blood, urine and hair samples, in violation of his rights under the Fourth and Fourteenth Amendments, which was their goal;

120.    As a direct and proximate result, ZD has experieNDed physical pain, suffered emotional distress; loss of and interference with the use of, property; denial of his liberty and other such compensatory damages as the evidence may establish;

## IV. SECOND CLAIM: CLAIM OF JOSHUA DASCHKE: CLAIM AGAINST DEFENDANTS HARTENSTEIN AND SIRESS: FOURTH AMENDMENT VIOLATIONS

121.    Plaintiffs reallege Paragraphs 1 through 120 as if fully set forth herein;

122.    This Claim is brought to vindicate rights of Joshua Daschke under the Fourth Amendment to the Constitution of the United States:

123.    Joshua Daschke was present in the dwelling on December 14, 2016;

124.    Joshua was awakened from sleep by a deputy ordering him out of his room;

125.    Joshua was present during the search of his home, and deputies seized electronic devices owned by himself and by his parents, which contained personal data reflecting his use of the devices and on-line activities;

126.    Deputies, at Defendants' direction, also searched Joshua's vehicle;

127.    Defendants caused the electronic devices to be examined by forensic specialists who downloaded and reviewed Joshua's activities;

128.    Defendants' actions, as set forth above, only having the facial aspect of compliance with the Fourth Amendment because of Defendants' falsehoods, misrepresentations and material omissions, violated Joshua's rights under the Fourth Amendment to be free of unreasonable searches and seizures;

129.    As a direct and proximate result, Joshua Daschke has suffered emotional distress; loss of and interference with the use of, property; denial of his liberty and other such compensatory damages as the evidence may establish;

## V. THIRD CLAIM: CLAIM OF KARL DASCHKE: CLAIM AGAINST DEFENDANTS HARTENSTEIN AND SIRESS: FOURTH AMENDMENT VIOLATIONS: SEARCH AND SEIZURE

130.    Plaintiffs reallege Paragraphs 1 through 129 as if fully set forth herein;

131.    This Claim is brought to vindicate rights of Karl Daschke under the Fourth Amendment to the Constitution of the United States:

132.    Karl Daschke was present in the dwelling on December 14, 2016;

133.    Karl was present during the search of his home, and deputies seized electronic devices owned by himself, which contained personal data reflecting his use of the devices and on-line activities;

134.    Deputies, at Defendants' direction, also searched three (3) vehicles jointly owned by Karl and Gretchen;

135.    Defendants caused the electronic devices to be examined by forensic specialists who downloaded and reviewed Karl's activities;

136.    Defendants' actions, as set forth above, only having the facial aspect of compliande with the Fourth Amendment because of Defendants' falsehoods, misrepresentations and material omissions, violated Karl's rights under the Fourth Amendment to be free of unreasonable searches and seizures;

137.    As a direct and proximate result, Karl Daschke has physical pain, suffered emotional distress; loss of and interference with the use of, property; denial of his liberty; costs associated with defense of his son ZD; and other such compensatory damages as the evidence may establish;

## VI. FOURTH CLAIM: CLAIM OF GRETCHEN DASCHKE: CLAIM AGAINST DEFENDANTS HARTENSTEIN AND SIRESS: FOURTH AMENDMENT VIOLATIONS: SEARCH AND SEIZURE

138.    Plaintiffs reallege Paragraphs 1 through 137 as if fully set forth herein;

139.    This Claim is brought to vindicate rights of Gretchen Daschke under the Fourth Amendment to the Constitution of the United States;

140.    Gretchen Daschke was present in the dwelling on December 14, 2016;

141.    Gretchen was present during the search of her home, and deputies seized electronic devices owned by herself, which contained personal data reflecting her use of the devices and on-line activities;

142.    Deputies, at Defendants' direction, also searched three (3) vehicles jointly owned by Karl and Gretchen;

143.    Defendants caused the electronic devices to be examined by forensic specialists who downloaded and reviewed Gretchen's activities;

144.    Defendants' actions, as set forth above, only having the facial aspect of compliande with the Fourth Amendment because of Defendants' falsehoods, misrepresentations and material omissions, violated Gretchen's rights under the Fourth Amendment to be free of unreasonable searches and seizures;

145.    As a direct and proximate result, Gretchen Daschke has suffered physical pain, emotional distress; loss of and interference with the use of, property; denial of her liberty; costs associated with defense of his son ZD; and other such compensatory damages as the evidence may establish;

## VII. FIFTH CLAIM: CLAIM OF ZD AGAINST DEFENDANTS HARTENSTEIN AND SIRESS: FOURTH, FIFTH AND FOURTEENTH AMENDMENTS: CONTINUING JUDICIAL DECEPTION

146.    Plaintiffs reallege Paragraphs 1 through 15 as if full set forth herein;

147.    This claim is brought pursuant to the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States;

148.    The forensic downloads of the Daschkes' electronic devices revealed that there was no connection with the organization and operation of #TucsonParties, nor any activity related to the advertisement or publication of the illegal activities being investigated by the Defendants;

149.    Despite knowing that nothing secured by the search in any way implicated ZD in the allegedly illegal activities of the party organizers, Defendants concealed this information from the Pima County Prosecutor, Dale Cardy, and from AZDCS;

150.    Further, Defendants detained and arrested a minor S E-V on February 1, 2017, and during his recorded interrogation, S E-V confirmed AC's earlier statement that one ZDwas not associated with the twitter account #TucsonParties;

151.    Despite this knowledge, Hartenstein falsified a Law Supplemental Narrative that was reviewed by Cardy, and claimed that S E-V had – after the recording device was turned off – informed him that ZD was "the person who operated the "TucsonParties twitter account, that S E-V had discussed this with ZD at one of the parties, and that the twitter account "was his main social media source of information about underage drinking parties…..;"

152.    Hartenstein's report was intended to buttress the previously-documented falsehoods in light of the absence of any evidence secured from the Daschkes that supported the previous claims;

153.    Defendants, by February 1, 2017, were under a duty to report the true facts to the prosecution that would have caused the prosecution on the allegations of Burglary, Criminal Damaging and felony Criminal Trespass to be dismissed. They were also under a duty to report that information to AZDCS and the Juvenile Court, which would have caused the dismissal of the dependency petition that interfered with the parents' rights. Rather than do so, they multiplied the falsification and concealment of evidence;

154.    It was not until February 17, 2017 that Hartenstein obtained a Search Warrant, No. 17 SW 9294, requiring Twitter to disclose account information and activities regarding #TucsonParties and two other twitter accounts, #AZHookups and #Uof AParties;

155.    Shortly thereafter, Twitter disclosed all information related to all three accounts, confirming that #TucsonParties account did not go active until October 31, 2016, and that the account was associated not with ZD, but was registered to one Jamie Guzman, who, to Plaintiffs' knowledge and belief, is an adult who attends the Unversity of Arizona. The other two accounts also disclosed no connection with ZD;

156.    Despite having this information, Defendants concealed it from Cardy, causing the prosecution to continue, violating his rights under the Fourth and Fifth Amendments to the Constitution of the United States;

157.   As a direct and proximate result, ZD suffered continuing emotional distress, Karl and Gretchen Daschke expended additional, unnecessary fuNDs in attorney fees and costs of defense of ZD in the criminal dependency case;

## VIII. SIXTH CLAIM: CLAIM OF ND: CLAIM AGAINST HARTENSTEIN AND SIRESS: FOURTH AMENDMENT VIOLATIONS

158.   Plaintiffs reallege Paragraphs 1 through 157 as if fully set forth herein;

159.   This Claim is brought to vindicate rights of ND under the Fourth Amendment to the Constitution of the United States:

160.   During the search of the dwelling on December 14th, deputies seized electronic devices owned or used by ND, which contained personal, private data reflecting his use of the devices and on-line activities;

161.   Defendants caused the electronic devices to be examined by forensic specialists who downloaded and reviewed ND's activities;

162.   Defendants' actions, as set forth above, only having the facial aspect of compliande with the Fourth Amendment because of Defendants' falsehoods, misrepresentations and material omissions, violated ND's rights under the Fourth Amendment to be free of unreasonable searches and seizures;

163.   As a direct and proximate result, ND has suffered physical pain, emotional distress; loss of and interference with the use of, property;

## IX. SEVENTH CLAIM: CLAIM OF ND AGAINST HARTENSTEIN AND SIRESS: FOURTH AMENDMENT VIOLATION IN SEIZURE BY AZDCS

164.   Plaintiffs reallege Paragraphs 1 through 163 as if fully set forth herein;

165.    This claim is brought to vindicate ND's rights against unreasonable searches and seizures under the Fourth and Fourteenth Amendments;

166.    The seizure of ND by AZDCS on Christmas Eve resulted directly and proximately from the delivery of false information about the Daschke family by these Defendants to AZDCS, and these Defendants' pressure on AZDCS to effect an emergency removal of the two boys;

167.    As a result, ND was seized, jailed and searched;

168.    As a result, ND has suffered loss of liberty and extreme emotional distress;

**X. EIGHTH CLAIM: CLAIM OF ND AGAINST THE AZDCS DEFENDANTS: FOURTH AMENDMENT VIOLATION IN SEIZURE BY AZDCS**

169.    Plaintiffs reallege Paragraphs 1 through 168 as if fully set forth herein;

170.    This claim is brought to vindicate ND's rights against unreasonable searches and seizures under the Fourth and Fourteenth Amendments;

171.    The seizure of ND by AZDCS resulted directly and proximately from the cooperation of the AZDCS Defendants with the Pima County Sheriff's investigation into the Mansion Parties; and the knowing or reckless documentation of false information intended to procure probable cause for the seizure of both boys;

172.    As a result, ND was seized, jailed and searched;

173.    As a result, ND has suffered physical injury, loss of liberty and extreme emotional distress;

## XI. NINTH CLAIM: CLAIM OF ZD AGAINST THE AZDCS DEFENDANTS: FOURTH AMENDMENT VIOLATION IN SEIZURE BY AZDCS

172.    Plaintiffs reallege Paragraphs 1 through 168 as if fully set forth herein;

173.    This claim is brought to vindicate ZD's rights against unreasonable searches and seizures under the Fourth and Fourteenth Amendments;

174.    The seizure of ZD by AZDCS resulted directly and proximately from the cooperation of the AZDCS Defendants with the Pima County Sheriff's investigation into the Mansion Parties; and the knowing or reckless documentation of false information intended to procure probable cause for the seizure of both boys;

175.    As a result, ZD was seized, jailed and searched;

176.    As a result, ZD has suffered physical injury, loss of liberty and extreme emotional distress;

## XII. TENTH CLAIM: CLAIM OF KARL, GRETCHEN, ZD AND ND AGAINST THE AZDCS DEFENDANTS AND HARTENSTEIN AND SIRESS: VIOLATIONS OF THE FIRST, FIFTH AND FOURTEENTH AMENDMENT FAMILIAL ASSOCIATION RIGHTS

177.    Plaintiffs reallege Paragraphs 1 through 176 as if fully set forth herein;

178.    These Plaintiffs enjoyed rights of familial association under the First, Fifth and Fourteenth Amendments to the Constitution of the United States. The minors enjoyed the right to care, comfort and protection of the parents; Karl and Gretchen enjoyed the same rights and additional rights to the control of decisions made about the minors' residence, associations, and medical and mental health evaluations and testing;

179.    Hartenstein and Siress acted to engage the AZDCS Defendants in a concerted plan to separate the parents from the minors in order to intimidate the parents and ZD into cooperating with the Pima County Sheriff's investigation of Mansion Parties;

180.    In order to accomplish the goal, all Defendants cooperated in memorializing false and misleading information, and in making material omissions in the documents by which they purported to establish probable cause that the minors were in imminent danger of abuse or neglect if not removed from the parents' custody on an emergency basis;

181.    The Defendants' acts and omissions accomplished the purpose, and resulted in both minors being seized and detained from December 22 to December 30, 2016, and both minors being searched and subjected to medical and mental health evaluations without consent;

182.    Further, the acts and omissions, which were compounded after Defendants possessed uncontradicted evidence that the basis for the removal and Petition for a Declaration of Dependency were invalid and false, caused the prosecution of that proceeding against the parents and minors to continue until the proceeding was dismissed on March 8, 2017;

183.    The Defendants' acts and omissions violated the rights of the Plaintiffs as set forth above;

184.    As a direct and proximate result, ZD and ND suffered emotional distress from the separation and the demands of detention, including medical and mental health

examinations and testing; Karl and Gretchen suffered emotional distress from the separation, and incurred attorney fees and costs in defending against the AZDCS Petition and the criminal Dependency Petition;

### XIII. ELEVENTH CLAIM: CLAIM OF KARL, GRETCHEN, ZD AND ND AGAINST THE AZCDS DEFENDANTS AND HARTENSTEIN AND SIRESS: FIRST AMENDMENT RETALIATION

185.    Plaintiffs reallege Paragraphs 1 through 184 as if fully set forth herein;

186.    The parents' direction to ZD to remain silent and answer no questions when contacted by Hartenstein and when he was subsequently arrested; and ZD's refusal to answer questions and cooperate with the Defendants' investigation, was protected expression under the First and Fourteenth Amendments to the Constitution of the United States;

187.    The Plaintiffs' refusal to cooperate with the constitutionally-infirm efforts of the AZDCS Defendants to compel ZD to give up his rights also constituted protected expression;

188.    The Defendants' acts and omissions set forth above were taken, at least in part, in retaliation against the Plaintiffs because of their protected expression, and violated the rights of the Plaintiffs as set forth above;

189.    As a direct and proximate result, each Plaintiff has suffered the injuries and losses as set forth above;

### XIV. TWELFTH CLAIM: CLAIM OF KARL, GRETCHEN ZD AND ND AGAINST HARTENSETIN, SIRESS AND THE AZDCS DEFENDANTS: PROCEDURAL DUE PROCESS VIOLATION

190.    Plaintiffs reallege Paragraphs 1 through 189 as if fully set forth herein;

191.    This claim is brought pursuant to the Fifth and Fourteenth Amendments to vindicate Plaintiffs Karl, Gretchen, ZD and ND's right to procedural due process.

192.    The actions of the Defendants, as set forth above, in falsifying information to secure the arrest of ZD and the emergency removal separating the boys from their parents; in placing ND in a place of detention that was intimidating and dangerous; in causing the boys to be subjected to medical and mental health examinations; in knowingly prosecuting the dependency petitions after having facts that established the basis for removal was invalid and concealing such facts from the Juvenile Court -- all were taken without providing due process to the Plaintiffs;

193.    These actions were not arbitrary nor negligent, but taken in furtherance of the ultimate goal of compelling the Daschkes to cooperate with the Pima County Sheriff investigation; and, following that failure, to punish them for refusing to cooperate and for Karl and Gretchen's insistence that ZD not communicate with investigators regarding any allegations made against him;

194.    As a direct and proximate result, Plaintiffs suffered the injuries and losses alleged above;

## XV. THIRTEENTH CLAIM: CLAIM OF KARL, GRETCHEN ZD AND ND AGAINST HARTENSTEIN, SIRESS AND THE AZDCS DEFENDANTS: SUBSTANTIVE DUE PROCESS VIOLATION

195.    Plaintiffs reallege Paragraphs 1 through 194 as if fully set forth herein;

196.    This claim is brought pursuant to the Fifth and Fourteenth Amendments to vindicate Plaintiffs Karl, Gretchen, ZD and ND's right to substantive procedural due process;

197.    The actions of the Defendants, as set forth above, in falsifying information to secure the arrest of ZD and the emergency removal separating the boys from their parents; in placing ND in a place of detention that was intimidating and dangerous; in causing the boys to be subject to medical and mental health examinations; in knowingly prosecuting the dependency petitions after having facts that established the basis for removal was invalid and concealing such facts from the Juvenile Court -- all were taken without providing due process to the Plaintiffs;

198.    These actions were not arbitrary nor negligent, but taken in furtherande of the ultimate goal of compelling the Daschkes to cooperate with the Pima County Sheriff investigation; and, following that failure, to punish them for refusing to cooperate and for Karl and Gretchen's insistence that ZD not communicate with investigators regarding any allegations made against him;

199.    These actions shock the conscience;

200.    As a direct and proximate result, Plaintiffs suffered the injuries and losses alleged above;

## XVI. FOURTEENTH CLAIM: CLAIM OF PLAINTIFFS AGAINST DEFENDANT NAPIER IN HIS OFFICIAL CAPACITY AND THE BOARD OF SUPERVISORS IN THEIR OFFICIAL CAPACITY

201.    Plaintiffs realleged Paragraphs 1 through 200 as if fully set forth herein;

202.   At all times pertinent hereto, Pima County Sheriff Department's Senior Command was the final policy-making authority regarding the conduct of the Mansion Parties investigations. At all times pertinent hereto, Defendants Napier and the Board of Supervisors were the real parties in interest in actions brought against the Pima County Sheriff in his official capacity;

203.   Napier, in his official capacity, is liable for the unconstitutional actions of deputies led by Hartenstein and Siress as set forth above, such actions having been explicitly or implicitly approved by Senior Command. Further, Napier, in his official capacity, ratified the unconstitutional conduct;

204.   As the party responsible for payment of damages resulting from judgment against Napier in his official capacity, the Board of Supervisors is a proper party-Defendant under this Claim;

205.   As a direct and proximate result of the actions taken by Napier, or delegated by him in his official capacity, the rights of the individual Plaintiffs under the First, Fourth, Fifth and Fourteenth Amendments were violated as set forth above;

206.   As a direct and proximate result, Plaintiffs have suffered the injuries and losses set forth above;

WHEREFORE, Plaintiffs demands judgment of Defendants, jointly and severally, as follows:

1.   Under all Claims, awards of compensatory damages to each Plaintiff in such amounts as the jury deems just;

2.   Under the Twelfth, Thirteenth and other Claims as apply, an award of

special damages to Karl and Gretchen Daschke;

3.     Under all claims directed to Defendants in their individual capacities, awards of punitive damages in such amounts as the jury deems just, for a total award of ten million dollars ($10,000,000.00);

4.     An award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

5.     Interest;

6.     Such other equitable relief as the Court deems just;

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
9040 North Placita Verde
Tucson, Arizona 85704
Telephone: 888-318-0075
mike@mgmoorelaw.com

Trial Counsel for Plaintiff

**JURY DEMAND**

Plaintiff demands trial by a jury of twelve (12) persons as to all issues.

/s/ Michael Garth Moore