**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Karl Daschke, et al.,

            Plaintiffs,

v.

Theodore Hartenstein, et al.,

            Defendants.

No. CV-17-00456-TUC-JGZ

**ORDER**

       In 2016, the Pima County Sherriff's Department investigated a series of break-ins at unoccupied homes listed for sale, which came to be known as "mansion parties." At some point during the Department's investigation, detectives began focusing on a juvenile, ZD, and ultimately obtained a warrant to search ZD's home, his family's vehicles, and all electronics. Following that search, the Sherriff's Department contacted Arizona's Department of Child Services, and various members of that agency took actions that resulted in the removal of ZD and his younger brother ND from the Daschke home. ZD, ND, and the rest of the Daschke family then sued members of the Sherriff's Department and Department of Child Services. Before the Court are five motions for summary judgment filed by various parties seeking judgment in their favor. The Court heard arguments on these Motions on August 20, 2019.

//

//

//

## **Factual Background**[1]

### I.    The Investigation and Arrest

Law enforcement started to receive reports of unauthorized house parties in the Tucson area during the summer of 2016.  These events tended to take place in unoccupied homes, often entailed alcohol and drug use by minors, and sometimes resulted in significant damage to the homes.  The parties were, at times, attended by hundreds of adolescents, and the date and location of each event was disseminated via various forms of social media.  The Pima County Sheriff's Department assigned Detective Theodore Hartenstein to lead an investigation into the parties.  (Doc. 155, ¶ 37.)  Detective Jonathan Siress joined the investigation in October 2016 as a member of the Department's Community Problems Unit.  (Doc. 155-9, pg. 5.)[2]

Following a mid-August break-in and party at one particular residence, 660 N. Mountain Side Way, which resulted in extensive damage to the home, law enforcement interviewed several adolescents who had attended the event.  One attendee, LD, stated that a person named "Z" had attended the party at 660 N. Mountain Side Way, but LD did not recall Z causing any damage to the home.  (Doc. 162-1, exh. 5, pg. 38.)  Another female student, AC, identified ZD as a white male who possibly ran the private Twitter account, "Tucson Addies"[3] or "Town Addies or something like that."  (Doc. 157-9, pgs. 4-5.)  Finally, a female student named TC informed law enforcement that she knew ZD.  (*E.g.*,

---

[1]   Throughout their briefing and attached statements of fact, the Parties refer to various facts as "undisputed," but many facts alleged to be undisputed are, in reality, disputed.  Moreover, many of the alleged statements misstate or are unsupported by the record.  A thorough review of the record was necessary to assess the claims alleged in this case.  The facts stated in this Order were drawn in large part from primary sources attached in support of the Parties' factual statements.  Where the Court cites to a Party's statement of facts, the Court independently verified from the record that the cited source supported the alleged fact, or the statement was uncontroverted.  Because the Court conducted an independent review of the record to ascertain the uncontroverted facts, the Court will deny Plaintiffs' Motion to Strike DCS Defendants' Objections to Plaintiffs' Statement of Controverting Facts and Separate Statement of Facts (Doc. 187) as moot.

[2]   Certain deposition exhibits, such as Detective Siress's in Doc. 155-9, include four pages of deposition transcript per CM/ECF page.  For such exhibits, the page citation is to the specific deposition transcript page, rather than to the CM/ECF page.

[3]   Neither AC nor anyone else interviewed by law enforcement suggested that ZD might be operating a different Twitter account.

Doc. 157-7, pg. 3.)  Law enforcement did not specifically ask TC if a person named ZD ever attended one of the house parties, but when TC was asked for the names of people who had caused damage to 660 N. Mountain Side Way, she replied that a student named "Z" had caused damage.[4]  (Doc. 157-6, pg. 10.)  She added, however, that she did not know "Z's" last name, and that he went by "Brizo (ph)."  (Doc. 155, ¶¶ 45-46, 53; Doc. 157-6, pg. 10.)  Law enforcement downloaded the contents of TC's phone.  (Doc. 155, ¶ 48.)  In the downloaded contents, law enforcement recovered a photo of an African American male under the contact name "Breezo Slaughter."  (Doc. 155, ¶ 56.)

Law enforcement also retrieved from the download one screenshotted photo from Snapchat of a naked male, whom TC identified as ZD.  (Doc. 155, ¶¶ 57, 60.)  TC told law enforcement that another friend had sent her the photo and further stated that she was friends with ZD.  (Doc. 157-6, pgs. 21-22.)  TC explicitly denied any form of a sexual relationship with ZD each time Officer Hartenstein asked about the nature of their relationship.  (*Id.*; Doc. 155, ¶¶ 59-60.)  Law enforcement also retrieved a text communication from "Z"—no last name specified—sent to TC on August 11, 2016, before the 660 N. Mountain Side Way party.  (Doc. 162, ¶ 10; Doc. 162-1, exh. 7, pg. 48.)  The text offered to "provide for that party" and stated that the sender could "go on some bottle runs" and "buy some bud."[5]  (*Id.*)  TC's phone download reflected 12 people named "Z" in her contact list.  (Doc. 155, ¶ 64.)

In addition to the photo and text, law enforcement obtained various random images of drugs, paraphernalia, alcohol, and mansion party-related social media activity.  (Docs. 156-5, 156-6.)  Law enforcement likewise obtained metadata from a snapchat conversation spanning from June 12, 2016, to August 19, 2016.  (Doc. 156-7.)  Most text entries in the conversation contained residential Tucson addresses, with no other information.  (*Id.*)  One

---

[4]  In a subsequent interview that took place after the search warrant issued, when asked specifically about ZD, TC state that she did not recall ZD causing any damage.  (Doc. 157-7, pg. 21.)

[5]  This screenshot was not included in the warrant affidavit later completed by Detectives Hartenstein and Siress.

participant on the conversation thread with a username resembling ZD's full name sent numerous messages with addresses to the other participants, but a different participant in the conversation shared the address "660 N. Mountain Side Way" with the group.[6] (*Id.*)

On November 30, 2016, Detective Hartenstein contacted ZD's father, Karl Daschke, to set up an appointment with the Department to interview ZD. Detective Hartenstein indicated that he had probable cause to charge ZD with a felony and would present the case for an arrest warrant if he did not hear back from Karl, but that he wanted to provide ZD with an opportunity to present his side first. Karl Daschke returned Detective Hartenstein's call to say that he did not consent to ZD attending any interview without an attorney or a parent present. (*See* Doc. 155-8, pgs. 29-30; Doc. 175-9.)

On December 13, based on the interviews with and the downloads obtained from TC, LD, and AC, Detectives Hartenstein and Siress filed an affidavit seeking a warrant to search ZD's person, his family's home, and all four vehicles kept at the home.[7] (Doc. 155-6). The affidavit contained the following statements: fingerprints and other DNA swabs had been collected at "several of the incidents"; ZD was known as an associate of several juveniles already arrested, and specifically, TC "identified [ZD] as a person she had an intimate sexual relationship with during an interview"; TC's cellphone contained images of alcohol, illegal drugs, and drug paraphernalia, as well as text conversations about drug use and sexual activity in connection with the mansion parties; one of the Twitter accounts that law enforcement had been monitoring, "Tucsonparties," had advertised the addresses where the mansion parties were to take place, and encouraged alcohol consumption, drug usage, and sexual activity; TC and AC said that ZD operated "Tucsonparties," and further stated that they had seen ZD at the party where the most criminal activities occurred, and that he was an active participant in the events of that party. The affidavit concluded by stating that "[t]he use of social media accessed through computers, cellular telephones[,]

---

[6] This conversation was not included in the warrant affidavit later completed by Detectives Hartenstein and Siress.

[7] Detective Hartenstein was responsible for providing all of the substantive information for the affidavit, aside from Detective Siress's qualifications and experience. (Doc. 155, ¶ 81.) Both officers executed the signed warrant. (Doc. 162, ¶ 36.)

and other electronic devices" was "key to the advertising and promotion of" the illegal activities at the mansion parties, and that it was likely there is more evidence of this activity contained within the cellular phone and other electronic devices to which [ZD] has access." (*Id.*)

That same day, based on the information supplied in the affidavit, an Arizona Superior Court judge signed a warrant authorizing the detectives to search: 1) ZD's person for prints and buccal swabs, 2) the family home where ZD resided, and 3) four cars kept at the residence—three registered to Karl and Gretchen Daschke, and one registered to Joshua Daschke. In the home and vehicles, the warrant authorized law enforcement to seize any narcotics or paraphernalia, any items that could identify suspects or co-conspirators as yet unidentified, and all cell phones or other electronic devices. The warrant further authorized law enforcement to complete a forensic download of all texts, photos, and other media contained on any of the cell phones or electronic devices, and to retain any evidence of burglary, criminal trespass, criminal damage, alcohol-related offenses, curfew violations, narcotics possession, criminal nuisance or disorderly conduct, and evidence of "permitting life, health, or morals of minor to be imperiled by neglect, abuse or immoral associations." (Doc. 155-5.)

Detectives Hartenstein and Siress were both part of the team that subsequently executed the warrant. (Doc. 162, ¶ 36.) During their search, the detectives retrieved a packet of cocaine in ZD's wallet and four partially filled liquor bottles in a van that ZD occasionally drove. (Doc. 162, ¶ 20.) ZD was later charged with burglary, criminal damage, criminal trespass, narcotics possession, and minor in possession. (Doc. 164-9, ¶ 39.) He pled guilty to criminal trespass and the remaining counts were dismissed. (Doc. 162, ¶ 31.)

## II. Subsequent Involvement by Child Services and Removal

On December 15, 2016, Detective Hartenstein reported the Daschke household to Arizona's Department of Child Services (DCS) hotline. (Doc. 128, ¶ 1; Doc. 128-4.) He detailed the criminal charges that ZD was facing and indicated that ZD had been caught

with cocaine on his person, alcohol in a car he operated, and vaping supplies in his bedroom. Detective Hartenstein reiterated much of the information submitted in the warrant affidavit, supplemented by what he had uncovered when searching the home. (Doc. 113, ¶ 6.) After calling DCS's hotline, Detective Hartenstein had a phone conversation with a DCS investigative case manager, Gerardo Talamantes, during which Hartenstein told Talamantes that another mansion party location had been publicized following the search of the Daschke home. (Doc. 113, ¶¶ 2, 7.) DCS assigned Talamantes to investigate Hartenstein's report, with the approval of Talamantes's supervisor, Mildred Jimenez. (Doc. 113, ¶¶ 2, 8.)

The Parties dispute much of what happened during DCS's investigation. In short, however, on December 20, Talamantes began interviewing members of the Daschke family, starting with the Daschke's 14-year old son, ND, while ND was at school. (Doc. 113, ¶¶ 1, 8; Doc. 1, ¶ 86.) According to Defendants, Talamantes spoke with the school counselor and assistant principal, who informed Talamantes that ND had cut his arms with a razor blade the day before, but that ND was nevertheless performing well in school. (Doc. 113 ¶ 8; Doc. 128-8, pg. 7.) Talamantes did not at any point actually see the damage to ND's arm, because ND did not disclose the incident to Talamantes. (Doc. 175-10, pg. 10.) Talamantes also met with Joshua, Karl, Gretchen Daschke, and ZD, and learned that ZD had a history of substance abuse dating back at least three years, starting with the use of a bong and vaping products (Doc. 164, ¶ 12), and progressing to oxycodone in 2015. (Doc. 175-10, pg. 4.) Gretchen Daschke informed Talamantes that ND had cut his arm because of something to do with his relationship with a girl, and that ND had told her that he would not do it again. (Doc. 113, exh. 1.) Talamantes concluded that Gretchen Daschke's only reaction to ND cutting himself was her decision to "keep an eye on him," and to meet with a school counselor, who could not provide self-help services. (Doc. 178, ¶¶ 11-12.) With regard to ZD, Talamantes learned that Gretchen and Karl had been aware of his drug use and had responded by grounding ZD, drug testing him, and threatening to take him to a drug rehabilitation center. (Doc. 175-10, pg. 4.)

According to Plaintiffs, they were reluctant to be too candid with Talamantes because they believed that he was conducting an investigation that paralleled law enforcement's. For this reason, Karl declined to comment on any of the allegations that ZD had been involved in criminal behavior and repeated his belief that law enforcement had sent DCS to their home on a fishing expedition, for lack of evidence against them. (Doc. 128-10, pg. 2.) Gretchen stated that a few years ago, she and Karl had found a bong in their home belonging to ZD and had grounded ZD for a month. (Doc. 128-9, pgs. 2-3.) The parents had ZD complete a monthly drug test and, as a result, learned that he had tested positive for oxycodone once in the previous year. (*Id.*) In response, they threatened to place ZD in rehab. (Doc. 175-3, pg. 4.) They also began to track his location on an IPhone app, grounded him, and monitored his appearance when he returned home from going out with friends. (*Id.*) As to ND, Gretchen states that she informed Talamantes that she had met with school officials to discuss ND's cutting, and that the parents were going to set up a meeting after the holiday break to discuss any further actions required. (Doc. 128, ¶ 11; Doc. 128-9, pg. 3.) Gretchen perceived ND's cuts to be "three small scratches." (Doc. 175-3, pg. 5; attached exh. 72.)

Based on Talamantes's conversation with ND and school officials, and the report filed by Detective Hartenstein, DCS decided to convene a "Team Decision Making" meeting to address the well-being of ZD and ND. On December 22, 2016, Talamantes, Jimenez, Detective Hartenstein, and a DCS "Team Decision Making" facilitator, Valerie Brown, met at the Daschke family home with Karl and Gretchen Daschke. (Doc. 113 ¶¶ 3, 8-9.) The parties dispute what occurred at the meeting, but based on the conversation, DCS officials concluded that they needed to remove ND and ZD from the home.[8] (Doc. 113, ¶ 11; Doc. 175, ¶ 20.) According to the DCS officials, removal was appropriate because it became apparent during the meeting that the parents were unwilling to take action in response to ZD's reported drug use and ND's recent cutting. (Doc. 175, ¶¶ 20,

---

[8] The Parties dispute whether Defendant Brown was involved in the decision to remove ZD and ND. (Doc. 128 ¶ 32; Doc. 178, ¶ 32.) At least one Defendant, Valerie Jimenez, recalled that Brown took part in the actual decision to remove the children. (Doc. 128-7, pg. 31.)

25, 30.)  According to the parents, the DCS officials conducted a hurried meeting consisting of under-explained intervention proposals, and the parents were unwilling to speak candidly because Detective Hartenstein was at the meeting and DCS officials were probing into the same activity for which ZD was then under investigation.  (Doc. 128, ¶ 23, 27-29.)

DCS removed ZD that day, and ND the following day.  (Doc. 113, ¶ 11.)  ZD was placed in residential group home La Paloma Victoria House.  ND was initially placed in Our Family Services homeless shelter, and then transferred to La Paloma Victoria House. On December 28, 2016, DCS filed a petition with the Arizona Superior Court, alleging that ND and ZD were dependent minors.  (Doc. 113, ¶ 12.)  The court issued a temporary order committing ND and ZD to DCS's custody.  (Doc. 113, ¶ 13.)  Two days later, during a temporary custody hearing, Talamantes testified that ZD should not return to his parents because in response to ZD's recent behavior, Gretchen and Karl were "trying the same methods and the same things," such as grounding ZD and drug testing him, while "expecting different results," even though his substance abuse had "escalated."  (Doc. 175-10, pgs. 7-8.)  With respect to ND, Talamantes testified that he had grown concerned after speaking to Gretchen Daschke that "her plan, or her action, was just to take [ND's] word for it that he would never" cut his arm again.  (Doc. 175-10, pg. 11.)

At the conclusion of the hearing, the court ordered that ND and ZD be returned to the family home.  (*Id.*)  The dependency action was ultimately dismissed on March 8, 2017. (Doc. 113, ¶ 13.)

## III.  The Lawsuit

Shortly after, Plaintiffs brought suit.  ZD, ND, Joshua, Karl, and Gretchen Daschke each allege that Detectives Hartenstein and Siress committed various Fourth Amendment violations during the course of searching the family home and other property, and, in ZD's case, for also failing to correct misinformation previously provided to the District Attorney's Office.  (Counts I-VII).  ZD and ND also allege Fourth Amendment violations against Department of Child Services Defendants (DCS Defendants)—Gerardo Talamantes, Mildred Jimenez, and Valerie Brown—for removing ZD and ND from their

parents (Counts VIII-IX).  ZD, ND, Karl, and Gretchen Daschke additionally allege that Hartenstein, Siress, and the DCS Defendants violated their familial association rights and committed procedural and substantive due process violations by removing ZD and ND (Counts X, XII-XIII).  Finally, ZD, ND, and Karl and Gretchen Daschke allege that Hartenstein, Siress, and the DCS Defendants retaliated against Plaintiffs for counseling ZD not to answer questions without an attorney present or otherwise cooperate with law enforcement's investigation (Count XI).

Before the Court are the Parties' various motions for summary judgment.  Plaintiffs have filed a Motion for Summary Judgment on their first four Fourth Amendment claims against Hartenstein and Siress,[9] and on their familial association claim against the DCS Defendants.  Hartenstein and Siress have filed a Motion for Summary Judgment on all claims pertaining to them (Counts I-VII, X-XIII).  And the DCS Defendants have filed a Motion for Summary Judgment on all claims against them (Counts VII-XIII).  The DCS Defendants have also filed a Partial Motion for Summary Judgment on all claims other than the retaliation claim, arguing that they are immune from suit.

## Summary Judgment Standard

Summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) that after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).  "Only disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[9]  ZD, ND, Karl, Gretchen, and Joshua all filed nearly identical claims against Detectives Hartenstein and Siress in Counts I-IV and VI.  Plaintiffs, however, only moved for summary judgment on Counts I-IV, and not on Joshua's claim alleged in Count VI. Because these claims are the same, and because Defendants' defense against Joshua's claim would be unlikely to differ from the defenses they assert in their briefing, the Court will construe Plaintiffs' Motion for Summary Judgment as moving on all five claims.  *See Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (acknowledging a court's authority to grant summary judgment *sua sponte* for a nonmoving party where unfair prejudice would not result).

248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering a motion for summary judgment, the court accepts as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; the non-moving party must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (holding that plaintiff must present affirmative evidence to defeat properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (nonmovant must present more than "some metaphysical doubt as to the material facts"). "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## Discussion

### I. Hartenstein and Siress

Plaintiffs collectively bring eleven claims against Detectives Hartenstein and Siress—seven involving alleged Fourth Amendment violations, and four involving alleged violations of other constitutional rights. Hartenstein and Siress move for Summary Judgment on all counts, arguing in part that they are entitled to qualified immunity from suit and in part that Plaintiffs fail to state a claim as to some of the counts. Plaintiffs move for Summary Judgment on four of the alleged Fourth Amendment violations.

#### a. Fourth Amendment Claims

The Complaint alleges that Hartenstein and Siress violated ZD's, Joshua Daschke's, Karl Daschke's, Gretchen Daschke's, and ND's Fourth and Fourteenth Amendment rights by including false information and omitting material facts from the warrant application, and then searching each family members' belongings, and in ZD's case, his person, without probable cause (Counts I-IV, VI). Similarly, the Complaint alleges that the Defendants further violated ZD's Fourth, Fifth, and Fourteenth Amendment rights by failing to report to the prosecuting attorneys when the detectives learned from Twitter that ZD was not associated with any of the Twitter accounts they believed him to have been associated with, thereby allowing the state to continue wrongfully prosecuting ZD (Count V).

### i. The Search Warrant

Defendants argue that ZD is barred from bringing suit for civil damages under *Heck v. Humphrey*, 512 U.S. 477 (1994), because ZD pled guilty to criminal trespass. Defendants further argue that the other family members "have no standing" as a result of *Heck*, because "[t]heir constitutional claims hinge on [ZD's] constitutional claims." (Doc. 181, pg. 5.) *Heck* holds that a plaintiff may not recover civil damages for an alleged constitutional violation where, in order to prevail in his suit, he would have to negate an element of an offense for which he had been convicted. *Id.* at 486.

*Heck* is not implicated by ZD's criminal trespass guilty plea. As an initial matter, Defendants do not describe what evidence, of the evidence seized pursuant to the search of the home, family members' electronic devices, and family cars, would have supported a guilty plea for criminal trespass.[10] *See id.* at 487 ("the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence"); *Schwartz v. City of Phoenix*, 83 F.Supp.2d 1102, 1104 (D. Ariz. 2000) ("Plaintiff can seek damages for an allegedly unreasonable search and seizure that did not produce evidence introduced at his criminal trial."). Moreover, ZD's "guilty plea in no way constituted an admission that the search . . . was proper under the Fourth Amendment."

---

[10] Neither party has supplied a copy of the indictment specifying the facts underlying this charge.

*Haring v. Prosise*, 462 U.S. 306, 318 (1983). "[I]t is impermissible for a court to assume that a plea of guilty is based on a defendant's determination that he would be unable to prevail on a motion to suppress evidence." *Id.*; *see also Ove v. Gwinn*, 264 F.3d 817, 823 (9th Cir. 2001) ("Their convictions derive from their pleas, not from verdicts obtained with supposedly illegal evidence. The validity of their convictions [for driving under the influence] does not in any way depend upon the legality of the blood draws." (emphasis omitted)). And even if ZD's civil suit was barred by *Heck*, Defendants offer no support for Defendants' claim that the other Plaintiffs should be precluded from arguing that the executed search was unreasonable as to their own Fourth Amendment rights.[11] *See Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007) (holding that *Heck* did not bar plaintiff from bringing suit to recover for Fourth Amendment violation where law enforcement tapped into plaintiff's call, because though the other person on the line was convicted, plaintiff "never was arrested or charged with a crime").

Defendants also argue that they are immune from suit. The doctrine of qualified immunity shields government officials "from liability for civil damages" where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When evaluating a claim for qualified immunity, the court determines whether the facts alleged or demonstrated make out a constitutional violation, and whether the right at issue was clearly established at the time of the defendants' alleged misconduct. *Id.* at 232, 236. A clearly established right is one that is

---

[11] The other members of the Daschke family allege violations of their own Fourth Amendment rights; they do not bring suit to vindicate ZD's rights. Specifically, Joshua Daschke alleges that his rights were violated when defendants seized *his* electronic devices and downloaded the contents to review his online activity, and when they searched *his* vehicle parked at the residence. Karl Daschke and Gretchen Daschke allege similar violations.

sufficiently clear that any reasonable official would understand that what he is doing violates that right. *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

Plaintiffs argue that Defendants Hartenstein and Siress should not be immune from liability stemming from Plaintiffs' Fourth Amendment claims—first because the Defendants obtained the warrant through judicial deception, and additionally because the warrant affidavit, on its face, lacked sufficient information to support a finding of probable cause, in that it did not include enough relevant information linking ZD to the house parties or indicate any causal connection between ZD's behavior and the places to be searched in the warrant.

"It is clearly established that judicial deception may not be employed to obtain a search warrant." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Franks v. Delaware,* 438 U.S. 154, 155–56 (1978)). To demonstrate that law enforcement officers obtained a warrant through judicial deception, a plaintiff must make a substantial showing "that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009) (quoting *KRL*, 384 F.3d at 1117); *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause," and a claim of judicial deception likewise may not be based on an officer's erroneous assumptions about the evidence he has received. *United States v. Smith*, 588 F.2d 737, 739-40 (9th Cir. 1978). If a party makes a substantial showing of deception, the court must determine the materiality of the allegedly false statements or omissions by purging those statements and determining whether what remains would have provided a substantial basis for issuing the warrant. *Ewing*, 588 F.3d at 1224.

The record reflects that the warrant affidavit, drafted by Hartenstein and attested to by Siress, contained several false or misleading statements and omissions. To begin, the information contained in the affidavit was supplied, in large part, by TC and AC. The affidavit stated that both knew ZD through school, and that TC "identified [ZD] as a person

she had an intimate sexual relationship with during an interview." (Doc. 155-6, pg. 5.) TC did not, during her interview with Detective Hartenstein, identify ZD as a person with whom she had an intimate sexual relationship; she unequivocally denied having had such a relationship. Detective Hartenstein now clarifies that the basis of that statement in the affidavit was an inference he drew, rather than what TC actually stated in her interview. (Doc. 182-1, ¶¶ 59, 85.) He now argues that his conclusion was reasonable, because in his view, TC would have had no way of recognizing ZD's naked frame or his bedroom in the photo downloaded from her cell phone absent such a relationship. (Doc. 161, pg. 7.) This conclusion is not as immediately apparent to the Court, and the statement contained in the affidavit was, if nothing else, misleading without Hartenstein's train of logic explained.

To establish ZD's connection to the mansion parties, the affidavit stated that both TC and AC informed law enforcement officials that they had seen ZD at the 660 N. Mountain Side Way, and that "he was an active participant at the events of that party." (Doc. 155-6, pg. 6.) TC identified a person named "Z," who went by "Brizo (ph.)" as having caused damage at the 660 N. Mountain Side Way party. (Doc. 157-6, pg. 10.) The Detectives did not conduct a follow-up investigation to determine who "Brizo" might be before obtaining the search warrant, but retrieved from TC's phone download an image of an African-American male named "Breezo Slaughter."[12]  (Doc. 155, ¶¶ 54, 56.) In AC's interview, she stated that ZD was present at the party (Doc. 157-9, pg. 20), and separately stated that she had "no idea" whether ZD had caused any damage at the party, but added that she knew he ran a private Twitter account for "Tucson Addies" or "Town Addies or something like that"—an account which posted addresses for the mansion parties. (*Id.* at pgs. 4-5; Doc. 155, ¶ 79.)

Much of the remaining affidavit details the activity of a different Twitter account, "Tucsonparties."  The affidavit falsely states that TC and AC indicated that ZD managed the "Tucsonparties" account, which was an account responsible for posting numerous addresses and invitations promoting underage drinking, drug use, and sexual activity.  TC

---

[12]  ZD is a Caucasian male.  (Doc. 155, ¶¶ 57, 60.)

and AC simply did not say that ZD ran "Tucsonparties," or even mention a Twitter account by that name in any context during their interviews.  In response to this statement of fact offered by Plaintiffs, Defendants argue that "[t]his statement of fact[] puts form of substance," because "TC and AC identified [Z] as disseminating the party times and locations through his Twitter account 'TucsonAddies.'"[13]  (Doc. 182-1, ¶ 90.)  Although, again, only AC identified ZD as operating "TucsonAddies," the undisputed fact remains that in Defendants' affidavit in support of the search warrant, Defendants included a Twitter account and the activity thereof entirely different from the one account identified by TC or AC during their interviews.

Plaintiffs have made a substantial showing that the detectives' false statements were, at the very least, made recklessly.  The sheer volume of false or exaggerated statements, layered on top of a warrant affidavit already almost entirely deficient in providing a basis for probable cause, would preclude a reasonable fact-finder from finding otherwise.  The false or misleading statements contained in the affidavit were all facts that were within one or both of the detective's personal knowledge.  For example, though only Detective Hartenstein interviewed TC, both Detective Hartenstein and Siress interviewed AC, and both knew that the Twitter account she provided was different from the one they included in their affidavit.  The affidavit also overstated ZD's purported involvement at the party—in exaggerating TC's statement and misrepresenting AC's.  The affidavit further misrepresented TC's relationship with ZD.  "The fact that the affidavit did not report important factual information that was within the [detective's] knowledge at the time" they

_____

[13]  Defendants appear to have targeted "Tucsonparties" because of various screenshots pulled from TC's phone, where TC had retweeted or otherwise recirculated messages posted by "Tucsonparties." (Doc. 155-7.) At oral argument, Defendants argued that this was justifiable because TC had informed Defendants that a Twitter account was being used to disseminate addresses, and Defendants located an account that was actively disseminating addresses. (Doc. 196.) This train of logic was not included in the warrant affidavit.  Defendants never took steps to verify the operator of "TucsonAddies"; they neither asked their technical support specialist, Megan Murray, to look into the account, nor subpoenaed Twitter for information on the account. (Doc. 155-8, pg. 117; Doc. 157-14, pg. 30; Doc. 156-9, exh. 43.) Instead, Defendants sent a search warrant to Twitter for information on "Tucsonparties"—but not until February 2017, two months after the execution of the search warrant. (Doc. 155-8, pgs. 98-99.) Detective Hartenstein stated in his deposition that they did so because they "still didn't know who was responsible" for operating "Tucsonparties." (Doc. 155-8, pg. 99.)

prepared the affidavit underscores "that the officers acted with at least a reckless disregard for the truth." *Chism v. Washington State*, 661 F.3d 380, 388 (9th Cir. 2011). "A reasonable factfinder could also find that the officers acted recklessly or intentionally because the false statements and omissions contained in the affidavit all *bolster* the case for probable cause, which suggests that the mistakes were not the product of mere negligence." *Id.* (emphasis in original).

The false statements and misrepresentations were also material to the warrant. Probable cause is determined by a totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). The issuing court's role is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. The affidavit should demonstrate that (1) a crime was committed, (2) that it was the suspect named in the affidavit who committed the crime, and (3) that evidence of the crime would be found in the place to be searched. *See Chism*, 661 F.3d at 389; *United States v. Flores*, 679 F.2d 173, 175 (9th Cir. 1982) ("there must be a sufficient relationship connecting the crime, the thing to be seized, and the place to be searched"). In other words, there must be "a nexus—automatically provided in the case of fruits, instrumentalities, or contraband—between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *Bill v. Brewer*, 799 F.3d 1295, 1301 (9th Cir. 2015).

In this case, even with the misstatements included in the affidavit, accepting everything as true, the warrant was not supported by probable cause that there was a fair probability that contraband or evidence of a crime would be found in ZD's home, family vehicles and all electronics. Of the content arguably pertaining to ZD, the affidavit stated that 1) fingerprints and DNA swabs [presumably of persons not yet identified] had been collected at "several of the incidents" occurring at 19 different addresses listed, 2) that ZD was an "active participant" in the events of a party where "most criminal damage

occurred," 3) that an excess of 30 parties had been advertised by a Twitter account operated by ZD, and that 4) these parties involved drug use and alcohol consumption. The affidavit added, with no articulated basis, that it was "likely there is more evidence of this [illegal party promotion] activity contained within the cellular phone and other electronic devices to which [ZD] has access." The affidavit also included attached screenshots of "Tucsonparties" account's online activity, as well as photos of TC, alcohol, and drug paraphernalia, again without any articulated connection to ZD's activity.[14]  (Doc. 155-6.)

With the possible exception of ZD's phone or computer, this information provided no basis to search any of the areas authorized by the warrant: ZD's person, the entirety of his family's home, including all electronics contained within, and the Daschke family's cars. There was no suggestion in the affidavit that ZD was driving to and from any of the house parties, that he himself was providing or consuming alcohol or drugs illicitly, or that he might have "property which was stolen or embezzled" or "fruits and instrumentalities of the crimes[] of burglary, criminal trespass, criminal damage, alcohol related offenses, curfew violation, possession of illegal narcotics," etc., in his car, home, or anywhere else.[15] The only house party where any witness placed ZD occurred in August of 2016, and law enforcement did not seek a warrant until December—four months later. *See United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983) ("To justify the search of a residence, the facts supporting the warrant must show probable cause to believe that the evidence sought is *presently* in the place to be searched." (emphasis added)); *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) ("'Staleness' is highly relevant to the legality of a search for a perishable or consumable object");  *cf. State v. Kasold*, 521 P.2d 995, 998 (Ariz. 1974) (Five month delay in seeking a warrant was acceptable where "[t]he evidence sought to be

---

[14]  Detective Hartenstein confirmed in his deposition that he had no information that ZD had actually sold or possessed drugs.  (Doc. 155-8, pg. 81.)

[15]  Even if there had been any basis for seizing the listed property, the warrant additionally failed to describe the property to be seized with the requisite particularity. *See United States v. Hillyard*, 677 F.2d 1336, 1339 (9th Cir. 1982). For example, the warrant authorized seizure of "Property which was stolen or embezzled," "Property used as a means of committing a public offense," and "Property or things in the possession of a person having the intent to use them as a means of committing a public offense."

obtained was not the type which would likely be consumed or thrown away in the five months, such as alcohol").

Removing the false statements from the affidavit only further undermines the basis for finding probable cause. The misstatement as to TC's relationship with ZD served to strengthen the inference that TC knew ZD well, or perhaps was more likely to have content received from or related to ZD on her phone, and removing that statement from the warrant undermines TC's credibility as to her statements about ZD. Even more central to supporting a finding of probable cause were the unsupported statements that ZD was heavily involved in causing damage to 660 N. Mountain Side Way, and that ZD operated an account called "Tucsonparties," alongside the many descriptions of posts made by "Tucsonparties" sharing addresses and referencing alcohol and drugs. The Court thus concludes that an accurate version of the affidavit would not have provided the issuing judge with a substantial basis for finding probable cause.

In sum, the Parties do not dispute the facts of what occurred or of what was said during interviews with Defendants, or what information was contained in the affidavit. Rather, the Parties dispute the proper standard for probable cause, and what constituted reasonable inferences, given the information known to Defendants. Accordingly, the Court will deny Defendants' Motion for Summary Judgment (Doc. 167) based on qualified immunity as to Counts I through IV and VI, and grant Plaintiffs' Partial Motion for Summary Judgment based on the Court's conclusion the warrant was not supported by probable cause, and that no reasonable juror could conclude otherwise. (Doc. 166.)

### ii. Criminal Charges Against ZD: Continuing Judicial Deception

Defendants also argue that they are entitled to summary judgment on Plaintiffs' fifth claim—that Defendants knowingly provided false information to the Pima County prosecutor responsible for prosecuting ZD's criminal case, and that Defendants failed to inform the prosecutor as they learned new information that would have exculpated ZD from the charges being brought. In support of their motion, Defendants do not provide any arguments directly responsive to Plaintiffs' claim. (Doc. 161, pg. 7.) Instead, they assert

- 18 -

conclusory statements, a number of which declare facts that were learned after the alleged conduct, and none of which rebut the argument that Defendants had an ongoing obligation to inform the Pima County prosecutor of information determined to be false, except insofar as to suggest that the specific facts never mattered. For instance, Defendants argue that ZD "created Twitter accounts that he used to distribute to over 100 followers information about the times and locations of underage drinking and drugging parties," and that ZD "himself attended 100-200 of these parties." (*Id.*) Neither of these arguments touch on why Defendants did not provide exculpatory information to Pima County, and neither of these facts were known by Defendants until ZD provided his deposition and declaration during discovery for this litigation, well after his criminal case had been prosecuted. (*See* Doc. 162-1, exhs. 2, 3.) Defendants' final argument is that the fact, "[t]hat [ZD] wasn't the primary organizer of the mansion parties is of no legal moment," (Doc. 161, pg. 17), which likewise fails to rebut the allegations in the Complaint. Because Defendants move for Summary Judgment without offering responsive arguments or facts to rebut Plaintiffs' allegations, the Court will deny Defendants' Motion as to Count V.

### b. Remaining Claims

#### i. First Amendment Retaliation

Plaintiffs allege that Defendants violated their First and Fourteenth Amendment rights by retaliating against ZD when he refused to answer Defendants' questions or to otherwise cooperate with law enforcement by arresting ZD following their search of his home and by reporting the Daschke family to DCS.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) (emphasis in original). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right[.]'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (first brackets in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (additional citation omitted). To prevail on a First Amendment retaliation claim, "a

plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (footnote omitted) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). A plaintiff must ultimately "'prove the elements of retaliatory animus as the cause of injury,' with causation being 'understood to be but-for causation.'" *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quoting *Hartman*, 547 U.S. at 260).

Defendants argument, in its entirety, is that "this claim is purely conclusory and conjectural" and that "the undisputed facts tell the true story."[16] (Doc. 161, pg. 19.) The moving party on a summary judgment motion bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Without further guidance on which undisputed facts bar this claim, the Court will deny Defendants' Motion for Summary Judgment as to Count XI.

### ii. Due Process, Familial Association, and Removal

Plaintiffs also allege that Detectives Hartenstein and Siress violated their procedural and substantive due process rights, as well as their right to familial association, by causing ZD and ND to be removed from the home. Defendants respond that Plaintiffs, in all three counts, "fail[] to state a claim."[17] (Doc. 161, pg. 20.) The Court will dismiss these three counts against the detectives.

To prevail on a claim alleging a procedural due process violation, a plaintiff must

---

[16] Defendants additionally argue, in one sentence, that "*Heck v. Humphrey* bars this claim." (Doc. 161, pg. 20.) Defendants provide no explanation for why *Heck* has any bearing in the First Amendment Retaliation context, and the Court finds none.

[17] Defendants also argue, again, that "*Heck v. Humphrey* bars th[ese] claims." (Doc. 161, pg. 20.) Defendants provide no explanation for why *Heck* has any bearing in the context, and the Court finds none.

demonstrate that the defendant deprived him of a constitutionally protected liberty or property interest and denial of adequate procedural protection. *E.g.*, *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Ed.*, 616 F.3d 963, 970 (9th Cir. 2010). "[T]he due process clause includes a substantive component which guards against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1407 (9th Cir. 1989). Finally, the right to familial association derives from the Fourteenth, First, and Fourth Amendments.[18] *Keates*, 883 F.3d at 1235. Courts have woven these "constitutional threads into a discrete constitutional right in cases where state officials remove children without consent or due process." *Id.* at 1236.

Here, the only allegations in the Complaint that might provide a basis for these claims are that Detective Hartenstein reiterated false or misleading information to DCS employee Talamantes, prompting DCS to launch an investigation into ZD's welfare at home, and that Detective Hartenstein was present for part of the meeting between DCS and the Daschke family that culminated in DCS's decision to remove ND and ZD. (Doc. 1, pgs. 17-18.) Plaintiffs do not claim that Detective Siress communicated with DCS at any point. As already established, Detective Hartenstein did not participate in the ultimate decision to remove either child, and DCS decided to remove ND and ZD based at least in part on information gleaned through DCS's own interviews and DCS's conversation with the Daschke parents at the family meeting. Plaintiffs do not respond to Defendants' argument for dismissing their procedural due process claim or right to familial association; they only respond to Defendants' argument as to their substantive due process claim insofar as it overlaps with their judicial deception claims, which the Court has already addressed. The Court will therefore grant Defendant Hartenstein's and Siress's Motion for Summary Judgment on Counts X, XII, and XIII.

Finally, the Complaint alleges that the Defendants violated ND's Fourth

---

[18]   The same legal standard applies to claims alleged under each Amendment. *Keates*, *v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018).

Amendment rights by conveying false information to DCS and causing ND to be unlawfully seized (Count VII). The Court will grant Defendants' Motion for Summary Judgment on this claim, alleged in Count VII. To the extent that Detective Hartenstein provided false information to DCS, most or all of it pertained to ZD; none of the information provided pertained to ND. DCS did not learn that ND had cut himself until it began its own investigation, and that fact formed the basis for DCS's decision to remove ND along with ZD following the "Team Decision Making" meeting. DCS's decision to remove ND from the home was thus too attenuated from Hartenstein's involvement to establish any Fourth Amendment violation on Hartenstein's part.

## II. DCS Defendants

Plaintiffs raise six claims against the DCS Defendants—Gerardo Talamantes, Mildred Jimenez, and Valerie Brown. ND and ZD each allege that the DCS Defendants violated their Fourth Amendment right against unreasonable searches and seizures when the Defendants removed the boys from their home in reliance on allegedly false information intended to procure probable cause to seize each boy (Counts VIII, IX). ZD, ND, Karl Daschke, and Gretchen Daschke similarly allege that Defendants violated their constitutional right to familial association, as well as their procedural[19] and substantive due process rights, when the Defendants removed the minors from the custody of their parents. (Counts X, XII, XIII.) Finally, the same Plaintiffs allege that Defendants retaliated against them when ZD refused to cooperate with Defendants' investigation (Count XI). Defendants assert that there is no genuine issue as to any material fact that would justify a jury trial on Plaintiffs' claims, and that Defendants are entitled to qualified immunity for their actions.

### a. Fourth Amendment Seizure, Familial Association, and Due Process

---

[19] Plaintiffs state in their response to DCS Defendants' Motion for Summary Judgment that they do not intend to pursue their procedural due process claim. (Doc. 174, pg. 1.) Accordingly, the Court will grant the DCS Defendants' Motion (Doc. 163) as to Count XII.

**Claims**

Plaintiffs' two Fourth Amendment seizure claims, one familial association claim, and one due process claim all hinge on the same alleged misconduct and are subject to a similar legal analysis.[20]

### i. Removal

Plaintiffs argue that Defendants violated various constitutional rights by removing ZD and ND from the home without first obtaining a court order. Defendants respond that there was no available state procedural mechanism other than direct removal by the DCS Defendants, and that they are entitled to qualified immunity for their actions because the alleged wrongfulness of their conduct was not clearly established at the time of removal and because ZD and ND faced at least potential imminent harm by remaining in the custody of their parents.

Defendants first assert that at the time of removal in 2016, DCS "caseworkers could not directly obtain a warrant or court order from the Superior Court to remove a child absent other child custody proceedings." (Doc. 112, pg. 12.) Defendants further assert that "even if caseworkers attempted to obtain pre-petition warrants or court orders, Arizona's Superior Court, in 2016, lacked the subject-matter jurisdiction to grant such requests." (*Id.*, pg. 13.) Thus, Defendants argue, they had a structural inability to obtain a warrant or court order prior to removal and to filing a dependency action.

In 2016, pursuant to the version of A.R.S. § 8-821(B) in effect at the time, a child could be taken into temporary custody by a child safety worker "if temporary custody [was] clearly necessary to protect the child because probable cause exist[ed] to believe that the child [was] either . . . [a] victim or [would] imminently become a victim of abuse or

---

[20] "Despite the different constitutional source of the right, we have held that 'the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children.'" *Keates v. Koile*, 883 F. 3d 1228, 1236 (9th Cir. 2018) (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000)). "Our cases hold that the Fourteenth, First, and Fourth Amendments provide a guarantee 'that parents will not be separated from their children without due process of law except in emergencies.'" *Id.* (quoting *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107–09 (9th Cir. 2001)). In addition, at oral argument, Plaintiff conceded that these individual claims all capture the same misconduct. (Doc. 195.)

neglect," or was suffering from a "serious physical or emotional injury."[21]  The statute did not explicitly provide for alternative circumstances under which DCS officials should seek a warrant or other court order in place of simply removing the child.  Defendants argue that a superior court would not have had the ability to issue an order even if DCS had sought one, noting that in *Glenn H. v. Hoskins*, 419 P.3d 567 (Ariz. Ct. App. 2018), the state appeals court held that the superior court did not have subject matter jurisdiction to grant a hospital's employees' oral requests made over the phone to perform a medical procedure on a minor patient whose parents did not consent.  *Glenn H* does not appear to foreclose the possibility of obtaining a warrant or order in this context, however, or explain why it would not have been possible for DCS to first file a complaint in a dependency action and immediately thereafter seek a removal order.  *See id.* at 571 ("Subject matter jurisdiction attaches to the superior court when a complaint or petition is filed."); *see also Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 264 P.3d 34, 35 (Ariz. Ct. App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'").  In any event, A.R.S. § 8-821(B) did still provide that DCS could only remove a child facing "imminent" abuse or neglect—the same legal standard that governs Defendants' qualified immunity argument.

Defendants assert that ZD and ND were, in fact, at imminent risk of harm in the home and that Defendants were therefore justified in removing both minors without legal process.  Defendants further assert that at the very least, their decision to remove both minors from the home was not contrary to clearly established law.  Qualified immunity, as previously stated, requires a two-part analysis.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The first question is whether the alleged facts show that the officials' conduct violated a constitutional right, and the second is whether the right violated was "clearly established"

---

[21]  The statute was amended in 2018 to allow for a child to be taken into temporary custody only pursuant to a court order, parental consent, or under exigent circumstances. A.R.S. §§ 8-821(A), (D) (2018).

at the time of the violation. *Id.* at 201. The assessment of whether a right was clearly established "must be undertaken in light of the specific context of the case," and not as a "broad general proposition." *Id.* Although "[s]pecific binding precedent is not required to show that a right is clearly established," *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (quoting *Brady v. Gebbie,* 859 F.2d 1543, 1557 (9th Cir.1988)), "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft*, 563 U.S. at 743).

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). "Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.* at 1138; *see also Mabe v. San Bernardino Cty., Dep't of Soc. Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001). "The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury." *Wallis*, 202 F.3d at 1138.

The Court first considers whether the DCS Defendants acted constitutionally when they took ND and ZD from the Daschke household. *See Demaree v. Pederson*, 887 F.3d 870, 880 (9th Cir. 2018) (assessing imminence in terms of days in a case arising out of Arizona, because the children were removed over Labor Day weekend when juvenile court was not open). No genuine issue of material fact precludes a finding that Defendants' removal decision was unlawful. Lacking in this case was the requisite exigency to justify removing ND and ZD on the spot, without first obtaining a court order. As Defendant Brown explained, DCS elected to proceed with a "considered removal," rather than an "emergency removal," because the "department felt there may have been safety concerns,

but not to the point where they would need to take the child[ren] at that moment in time to ensure their safety." (Doc. 128-8, pgs. 32, 85.) Instead of immediately removing the children following Defendant Talamantes' initial investigation, according to Brown, the department "felt that there were safety concerns that would need to be discussed at a table to determine how that safety threat would be addressed in order to ensure" the safety of ND and ZD. (*Id.* at pg. 32.) Each of the Defendants reiterated that they had concerns about how ND and ZD were faring in their home, but wanted to see whether the parents were amenable to new parenting techniques that might tamper ZD's alleged behavior and ND's recent cutting.

The imminent injury assessed by DCS in this case is less egregious than in other warrantless removal cases where courts have held that the risk of injury was not sufficiently imminent to justify removal. In *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007), for example, the local child protective services (CPS) received a report of child neglect in the Rogers' home. The CPS workers discovered that the two Rogers children had multiple bruises on their legs, that one had a large scratch on her face, along with "unkempt hair that appeared to be thin and missing in some areas," that the other suffered from "severe bottle rot," and that, in general, the children appeared to be very pale and possibly suffering from a vitamin deficiency from lack of sunlight. *Id.* at 1292-93. The conditions in the home were likewise alleged to have been unsuitable for the children, with garbage overflowing throughout the house, dirty bedding and mattresses without frames, what a CPS worker "believed to be feces smeared on the wall," and "vomit in the bottom drawer of a night stand." *Id.* at 1293. The parents also stated that they had a habit of locking the children in their rooms each night or when the parents showered, and the CPS workers observed five guns in the parents' bedroom, one of which was kept loaded. *Id.* Based on these observations, the CPS workers decided to remove the children from their home immediately, prior to seeking court authorization. *Id.*

The Ninth Circuit concluded that even accepting the CPS workers' description of the home conditions as true, because the workers could have obtained a warrant within a

matter of hours, they were not justified in removing the children without a court order. *Id.* at 1296. The court concluded that there was "no indication in the record of any particular risk that the Rogers children would become seriously ill during the few hours that it would take [CPS] to obtain a warrant." *Id.* The court acknowledged that "the Rogers children were in a sorry state and suffering from neglect of a type that could, if their parents' conduct was not modified within a reasonable period of time, lead to long-term harm," but nonetheless concluded that the danger to the children was not sufficiently imminent. *Id.* at 1298.

In this case, the DCS Defendants believed, from Detective Hartenstein's call to their hotline, that ZD was involved in dangerous house parties that entailed underaged drinking and drug consumption, and that he was actively organizing these gatherings for hundreds of youths in the community. They were further aware that law enforcement had recently discovered cocaine in ZD's wallet and empty or partially empty alcohol bottles in one of the Daschke family's cars. From ZD's parents' own disclosure, DCS knew that ZD had a history of drug use. Defendants describe what they perceived to be an escalation in his use of drugs, or, at the very least, his persistence in using these substances, as one of reasons underpinning their decision to remove him from the home. As to ND, although the record does not reflect that any of the Defendants actually saw his arm, Defendant Talamantes had learned from employees at ND's school that ND had very recently cut his arm in a few places with a razor blade. Defendants confirmed that the parents were aware of this behavior, and learned from Gretchen that she believed that a troubled relationship with a girl at school had prompted ND to do this.

Accepting DCS's account of ZD's and ND's behavior, Defendants do not point to any facts, disputed or otherwise, that suggest imminent harm that ZD faced arising from neglect. Even if ZD's drug use had "escalated" over time, Defendants do not explain why they believed that ZD, after living with his parents for years, faced imminent danger in the coming hours or days or even weeks from the behavior that he had, with some regularity, engaged in over the course of several years. Likewise with ND—although his recent

cutting may have given cause for alarm—Defendants identify no reason that they had to believe that ND was likely to cut his arm again soon, or to engage in any other form of self-destructive behavior if not immediately taken from his family. DCS's interviews with Karl and Gretchen Daschke further undermine the conclusion that ZD and ND faced imminent harm. The parents stated that they had, over the years, grounded ZD, submitted him to drug tests, threatened to send him to a drug rehabilitation facility, monitored his coming and going on weekend evenings, and tracked his location on his phone. In light of ND's cutting, Gretchen had met with a school counselor the same day to discuss the incident, had spoken to ND, and informed Defendant Talamantes that she planned to keep an eye on ND.

Defendants emphasize that the parents' unwillingness to discuss possible ideas as to how better to address ZD's and ND's behaviors ultimately provided the basis for Defendants' decision to remove the children. Defendants highlight that in prior cases, a parent's willingness to cooperate with DCS or its equivalent contributed to the court's conclusion that warrantless removal was unconstitutional. *See e.g.*, *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 792 (9th Cir. 2016) (mother "had demonstrated no resistance to the social workers' intervention"). In this case, however, Karl and Gretchen Daschke stated up front their unwillingness to fully participate in the "Team Decision Making" meeting because of Detective Hartenstein's presence at the gathering. Whether Defendants found this position to be reasonable or not, the Daschke parents had, at least, provided Defendants some explanation for what Defendants perceived as their refusal to cooperate that did not necessarily suggest that the parents would never be amenable to cooperation, or that the parents rejected the notion that either ZD or ND was struggling with issues that necessitated parental intervention of some kind. *See Mabe*, 237 F.3d at 1107-08 (mother's hostility to the social worker did not necessarily give rise to a reasonable fear that her child was in in imminent physical danger).

Ultimately, Defendants were aware that Karl and Gretchen knew about ND's and ZD's behavior. Defendants were aware that the parents had taken steps in the past and

continued to take steps to address each child's behavior. Without any indication that ZD and ND were likely to suffer serious harm following the "Team Decision Making" meeting absent parental cooperation, Defendants' decision to remove the children without first obtaining a court order was not reasonable, even accepting all facts most favorable to and asserted by Defendants. No genuine issue of material fact precludes a finding otherwise.

The Court next assesses whether the law was clearly established such that a reasonable social worker would have been on notice that removing ND and ZD from the home under these circumstances, without a court order, violated the law. Although "[s]pecific binding precedent is not required to show that a right is clearly established," *Calabretta*, 189 F.3d at 813 (quoting *Brady*, 859 F.2d at 1557), "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Defendants assert that this was a parental neglect case. (Doc. 112, pgs. 8, 11.) At the time DCS removed the Daschke children, the law clearly established that a child could not be removed from a parent's custody to prevent neglect absent imminent danger of serious harm to the child. *See Kirkpatrick*, 843 F.3d at 790-92; *Rogers*, 487 F.3d at 1294-96.

Although there is no factually identical case on point, Ninth Circuit precedent was sufficiently clear to have provided Defendants with "fair warning" that their conduct was unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As already outlined in some detail, *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007), bears significant resemblance to this case. There too, the court addressed whether a child services worker's decision to remove children, whom the worker believed had been neglected, was reasonable. The court noted that the bottle rot, as well as overall filth of the living conditions, were "chronic, ongoing problem[s]," and that although the presence of "droppings, feces, and other matter" might have "increase[d] the risk of eventual illness," there was "no indication in the record of any particular risk that the Rogers children would become seriously ill during the few hours that it would take Royal to obtain a warrant." *Id.* at 1295-96. Likewise, ZD's drug use was ongoing over a period of many years. Although DCS noted that his drug use appeared to have "escalated," in that he had recently been found with harder

substances, DCS points to no facts to establish that he faced immediate harm in the hours or days following the "Team Decision Making" meeting absent adoption of DCS-recommended parental intervention or programming. DCS highlights that the Twitter account they believed ZD to have been operating had tweeted about a mansion party after the detectives had executed their warrant on the house, demonstrating that any efforts that the Daschke parents had been making to supervise ZD had failed. But DCS does not explain why advertising an event that might involve illegal activity posed any immediate threat to *ZD* under his parents' care.

In *Rogers*, the court also concluded that child services worker's "actions after seeing the children also tend[ed] to support the view that the circumstances were not exigent," because "[i]nstead of taking prompt action to obtain medical care" as would have been expected if "the children faced imminent danger of serious harm to their health," the worker "spent close to two hours talking with the family before deciding to remove the children from the parental home." *Id.* at 1296. Similarly, in this case, DCS Defendants state that they did not view the danger posed to ND or ZD as imminent until, after convening a meeting with the parents, they concluded that the parents were unwilling to take appropriate action to address ND's and ZD's problems. DCS Defendants do not explain, however, why the threats facing ND and ZD were suddenly then imminent, if the Daschke parents were unwilling to cooperate with DCS but were presumably planning to carry on with whatever degree of supervision that had been in place immediately before the meeting.

The *Rogers* court found relevant the observation of the doctor who treated the children in that case immediately following removal as "to the question of how serious the children's conditions would have appeared to the reasonable social worker." *Id.* at 1295 n.4. Upon placement in temporary housing, ND and ZD were evaluated and deemed to be a "low" immediate safety risk to themselves or others. (Docs. 175-12, 175-13.)[22] ZD was

---

[22] The official who conducted these assessments, Guadalupe Valenzuela, testified as to the statements made in these reports during his deposition. (Doc. 164-1.) Valenzuela was an employee at La Frontera, an agency responsible for completing "Rapid Response[s]," a process completed for each removed child before housing placement. (*Id.*)

additionally found to have "[n]o presence of dangerous/harmful behavior." (Doc. 175-13.) Further, there is no support for a finding that, once placed in temporary housing, ND and ZD were suddenly subjected to all of the treatment programs or initiatives that DCS had envisioned implementing under the Daschke parents' supervision. Removal thus solved none of the problems that it might have in a case like *Rogers*, where the official removed the children from a perceived-to-be toxic environment over to a sterilized facility for treatment—and even there, the *Rogers* court criticized the decision to bring the children to a hospital for a routine screening visit, rather than in for an emergency call. *Id.* at 1296.

Because the law was clearly established at the time, and because no genuine issue of material fact precludes a finding that Defendants acted unreasonably by removing ND and ZD under the circumstances, the Court will grant Plaintiffs' Motion for Summary Judgment against Defendants Jimenez and Talamantes, but deny the Motion as to Defendant Brown, because the parties dispute whether she was involved in the ultimate decision to remove the children. Plaintiff has conceded that Counts VIII, IX, X, XII, and XIII target the same impermissible conduct. The Court thus grants Plaintiffs' Motion as to all of these Counts.[23] For the same reasons, the Court denies Defendants' Motion as to these Counts.

### ii. Dependency Proceedings and Temporary Placement

Plaintiffs additionally allege that Defendants made false statements in their dependency petition and other related filings. As a general matter, child protective services caseworkers are entitled to absolute immunity for their decision to initiate dependency proceedings, but not "from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury." *Beltran v. Santa Clara Cty.*, 514 F.3d 906, 908 (9th Cir. 2008) (per curiam).

In this case, Plaintiffs highlight that the DCS Defendants reiterated false statements provided by Detective Hartenstein regarding ZD's twitter activity and involvement in the mansion parties, without conducting any investigation to corroborate law enforcement's

---

[23] Plaintiffs will not, accordingly, be permitted to recover damages on each individual Count.

suspicions or to back up ZD's charges at the time. Plaintiffs do not explain, however, why the DCS Defendants would have had any cause to doubt the veracity of the information provided by law enforcement or explain why DCS had an affirmative duty to replicate law enforcements' efforts in order to confirm whether Detective Hartenstein's statements were true. *See Sjurset v. Button*, 810 F.3d 609, 621 (9th Cir. 2015) ("Law enforcement officers and agencies are entitled to rely on one another to a certain extent.") (citing *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986)) (emphasis omitted)). Moreover, Talamantes was present at the dependency hearing and cross-examined about the petition by Plaintiffs' attorneys. (Doc. 175-10.) Because Plaintiffs have not pointed to any facts that would support a finding or logical inference that DCS knowingly included false statements in its dependency petition and in related proceedings, the Court will grant Defendants summary judgment for any liability stemming from these allegations.

Plaintiffs also fault Defendants for the alleged harm suffered by ZD and ND once they were removed and placed in temporary housing. Plaintiffs have not demonstrated, however, that any harm resulting from the care provided in the temporary housing facilities was caused by Defendants. Defendants are not alleged to have known about the conditions in the home, or to have had any oversight or control over the staff in the homes.[24] The Court will thus grant summary judgment for any liability stemming from these allegations as well.[25]

### b. First Amendment Retaliation

Finally, Plaintiffs allege that DCS Defendants unconstitutionally retaliated against ZD for exercising his First Amendment rights. To prevail on this claim, Plaintiffs must demonstrate that a substantial or motivating factor behind Defendants' decisions to launch their investigation, remove ND and ZD, and initiate dependency action was to retaliate

---

[24] Talamantes stated that he was not aware of DCS's specific protocol oversight of placement homes. (Doc. 175-6, pgs. 3-4.) There is insufficient record evidence to create an issue of fact as to whether the alleged harm that befell ZD and ND in their temporary housing was reasonably foreseeable by DCS.

[25] Although it is true, as Plaintiffs argue, that removing a child in and of itself can constitute harm, that harm is distinct from the additional harm that Plaintiffs allege befell both ND and ZD once placed in their temporary housing.

against ZD's and his family's decision not to volunteer information to law enforcement during law enforcement's criminal investigation into ZD's involvement in the mansion parties. *See Corales v. Bennett*, 567 F.3d 554, 563 (9th Cir. 2009).

As Defendants note, Plaintiffs have failed to establish sufficient facts to support this claim. Absent from Plaintiffs' Complaint are facts that could lead a reasonable juror to believe that DCS launched an investigation on Detective Hartenstein's behalf, rather than out of concern—however well-intentioned or misguided—for the Daschke children's welfare, or that DCS invited Detective Hartenstein to the family meeting in order to chill family cooperation, so as to justify removal. Plaintiffs emphasize that Talamantes knew that Karl and Gretchen Daschke had failed to answer questions about ZD's alleged criminal activity and of their concern that the results of any drug tests would be passed on to law enforcement, but failed to reassure them that DCS would not disclose certain information to Detective Hartenstein. (Doc. 174, pg. 14.) Simply knowing that the Daschkes might have been uncooperative in ZD's criminal investigation, however, does not impute onto Talamantes a motive to retaliate against the family for that behavior, or to chill that behavior moving forward. Likewise, Detective Hartenstein's presence at the "Team Decision Making" family meeting does not necessarily suggest that DCS was actively working with Detective Hartenstein to ensure that ZD and the family cooperated in ZD's active criminal investigation. As to the actual decision to remove, Jimenez recalls that Detective Hartenstein suggested in-home services for ND and ZD, rather than removal. (Doc. 128-7, pg. 34.)

The Court will therefore grant Defendants' Motion for Summary Judgment as to Count XI.

### Conclusion

In summary, with regards to Detectives Hartenstein and Siress, the Court will grant Plaintiffs' Motion for Summary Judgment on their illegal search claims (Counts I-IV, VI). The Court will deny the law enforcement Defendants' Motion for Summary Judgment

based on qualified immunity on the same claims. The Court will grant Defendants' Motion for Summary Judgment on ND's claim for illegal seizure (Count VII), as well as on Plaintiffs' familial association, procedural due process, and substantive due process claims (Counts X, XII, XIII), but will deny Defendants' Motion as to the remaining claims. Thus, Defendants Hartenstein and Siress will proceed to trial on Plaintiffs' continuing judicial deception and first amendment retaliation claims (Counts VI and XI).

As for the DCS Defendants, Plaintiffs' Motion for Summary Judgment on the familial association claim (Count X), and by extension, claims for illegal seizure of a person (Counts VIII, IX) and violation of substantive due process (Count XIII), is granted against Defendants Jimenez and Talamantes. Defendants' Motions for Summary Judgment based on qualified immunity and on an absence of genuine issue of material fact, are denied. These claims against Defendant Brown will proceed to trial in order for a jury to determined whether Brown was involved in the ultimate decision to remove the children. The Court will grant the DCS Defendants' Motion for Summary Judgment on Plaintiffs' first amendment retaliation claim (Count XI) and procedural due process claim (Count XII).

Accordingly,

IT IS ORDERED:

1. Plaintiffs' Motion for Summary Judgment against Defendants Hartenstein and Siress (Doc. 166) is GRANTED as to Counts I-IV and VI against each Defendant.

2. Plaintiffs' Motion for Summary Judgment against DCS Defendants (Doc. 158) is GRANTED as to Counts VIII, IX, X, and XIII against Defendants Talamantes and Jimenez, but denied as to the same Counts against Defendant Brown.

3. Defendants Hartenstein and Siress's Motion for Summary Judgment (Doc. 167) is GRANTED as to Counts VII and X, XII, and XIII, and DENIED as to Counts I-VI and XI.

4. DCS Defendants' Motion for Summary Judgment (Doc. 163) is GRANTED as to Counts XI and XII and DENIED as to Counts VIII-X and XIII.

5. DCS Defendants' Partial Motion for Summary Judgment (Doc. 112) is DENIED as to Counts VIII, IX, X, and XIII, but GRANTED as to Count XII.

6. Plaintiffs' Motion to Strike DCS Defendants' Objections to Plaintiffs' Statement of Controverting Facts and Separate Statement of Facts (Doc. 187) is DENIED as moot.

Dated this 27th day of September, 2019.

_____
Honorable Jennifer G. Zipps
United States District Judge